### PORT AUTHORITY OF CITY OF ST. PAUL AND OTHERS v. FRED W. FISHER.

132 N. W. (2d) 183.

September 11, 1964—No. 39,411.

*Dorsey, Owen, Marquart, Windhorst & West* and *DeForest Spencer, Jr.,* for appellant.

*Norman E. Biorn,* for respondent American Hoist & Derrick Company.

*Donald L. Lais,* Corporation Counsel, and *Louis P. Sheahan,* Director of Law, for other respondents.

NELSON, JUSTICE.

This suit was brought in the District Court of Ramsey County by Port Authority of the City of St. Paul, a body politic and corporate and a governmental subdivision; Richard C. Radman, Bernard T. Holland, Neil Griebenow, Robert E. Peterson, H. William Blake, and John Rendall, commissioners of said port authority; and American Hoist & Derrick Company, a Minnesota corporation, against Fred W. Fisher, commissioner and president of said port authority. A declaratory judgment was sought adjudging and declaring that a proposed public contract denominated "Lease," together with its provisions, terms, and conditions, is in conformity with and duly authorized by Minn. St. c. 458; that said statute, in so far as it authorizes the proposed public contract and the issuance and sale of revenue bonds pursuant to it, is valid and constitutional; that such bond issue and the proposed expenditure of proceeds of the same to defray improvement construction costs incurred by said Authority pursuant to the proposed public contract are valid under the provisions of c. 458; that by virtue of said c. 458 the commissioners are granted authority and power to approve and authorize the execution and delivery by said Authority of said proposed public contract and to validly adopt Resolution No. 229 and motion approving and authorizing such action as adopted at a special meeting on June 20, 1963; that defendant is duly authorized and empowered to execute and deliver the proposed public contract in the name and on behalf of said Authority; and that said defendant has the duty, in his capacity as president, to so execute and deliver the same; that defendant, as president of the Authority, subject to the execution and delivery of said proposed public contract by and between the said parties thereto, will be authorized and empowered to

execute and deliver said revenue bonds of the Authority, pursuant to its terms and provisions; that any and all such revenue bonds which may be issued and sold pursuant thereto and subsequent to the execution and delivery of said proposed public contract will be deemed valid and enforceable according to their tenor.

The defendant, Fred W. Fisher, refused to execute the lease agreement on the ground that the proposed contract and revenue bond issue are neither constitutional nor lawful under the provisions of c. 458. The district court ordered judgment in favor of their validity. This appeal by defendant is from the judgment entered.

Under the proposed contract denominated "Lease" the Port Authority would lease certain real property owned by it to the American Hoist & Derrick Company together with certain buildings and structures to be erected thereon which are intended to be suitable for use as an office building, an engineering research center, a manufacturing facility, a restaurant, an automobile parking lot, and a tunnel which will lead to other property presently owned or leased by the company on an adjacent block. The estimated cost of the improvements to be paid by the Authority from the proceeds of the sale of its revenue bonds would be $1,200,000.

The Port Authority is a governmental subdivision authorized to exercise all of its powers and duties within the boundaries of the city of St. Paul. It consists of seven commissioners, six of whom were plaintiffs herein. Originally a port authority's powers and duties were generally confined to promoting the welfare of the port district, developing commerce within the district, and providing bulkheads, jetties, piers, wharves, docks, landing places, warehouses, and other transportation facilities.[1] By L. 1957, c. 812, a port authority was empowered to create industrial development districts. Minn. St. 458.191, subd. 1, provides:

"The port authority * * * may * * * create industrial development districts within the port district and define the boundaries thereof if it finds that the creation of such development district or districts is

---

[1] See, Minn. St. 458.16 and 458.17.

proper and desirable in establishing and developing a system of harbor and river improvements and industrial developments in each port district."

Section 458.191, subd. 2, provides in part:

"It is hereby declared to be the public policy of the legislature of the state of Minnesota that it is in the public interest to empower the port authority to employ the power of eminent domain, and for such port authority to advance and expend public moneys for the purposes contained in Laws 1957, Chapter 812, and to provide for means by which marginal area properties may be developed or redeveloped in accordance with the legislative policies hereinafter stated."

Section 458.191, subd. 2, in stating the legislative policies, declares in effect that the development and redevelopment of marginal area properties is necessary to the economic security and general welfare of the inhabitants of the port district; that such development and redevelopment cannot be accomplished by private enterprise alone without public assistance; that when such development and redevelopment cannot be accomplished by private enterprise alone it is in the public interest to employ the power of eminent domain and advance or expend public moneys for such purpose; that such development and redevelopment are public uses and purposes for which public moneys may be advanced or expended and private property acquired, and are governmental functions and of state concern in the interest of health, safety, and welfare of the people of the state and the communities in which such areas exist; that the necessity in the public interest is a matter of legislative determination. It is further declared that marginal lands are a serious menace which is injurious to the health, safety, and welfare of the people of the state and the communities in which such areas exist; that such marginal lands cannot be remedied solely by regulatory processes of the police power; that such marginal lands contribute substantially and increasingly to the incidence of crime and juvenile delinquency and necessitate disproportionate expenditures for crime prevention, correction, prosecution, and punishment, and for maintenance of adequate police, fire, and accident protection, and other

public facilities and services; that the benefits resulting from remedying marginal lands will accrue to all the inhabitants and property owners in the communities in which such lands exist; that while marginal property remains unchanged the owner of neighboring property lacks incentive and ability to improve his land with the result that such conditions tend toward further obsolescence, deterioration, and disuse; that such deterioration of marginal land frequently can be halted only by redeveloping the entire area or substantial portions thereof; that private assembly of areas for redevelopment is uneconomic and practically impossible in many instances due to the legal power and excessive expenditures necessary to the acquisition of marginal lands which are subdivided into small parcels and held in scattered ownerships under frequently defective titles; that the sale or leasing of land which has been developed or redeveloped is incidental to the fundamental purpose of removing the condition causing the property to be marginal.

"Marginal lands" are defined in § 458.191, subd. 4, as follows:

" 'Marginal lands' is defined and characterized by any one or more of the following described conditions:

"(1) An economic dislocation, deterioration, or disuse resulting from faulty planning.

"(2) The subdividing and sale of lots of irregular form and shape and inadequate size for proper usefulness and development.

"(3) The laying out of lots in disregard of the contours and other physical characteristics of the ground and surrounding conditions.

"(4) The existence of inadequate streets, open spaces, and inadequate utilities.

"(5) The existence of lots or other areas which are subject to being submerged by water.

"(6) By a prevalence of depreciated values, impaired investments, and social and economic maladjustment to such an extent that the capacity to pay taxes is reduced and tax receipts are inadequate for the cost of public services rendered.

"(7) In some parts of marginal lands, a growing or total lack of proper utilization of areas, resulting in a stagnant and unproductive

condition of land potentially useful and valuable for contributing to the public health, safety and welfare.

"(8)   In other parts of marginal lands, a loss of population and reduction of proper utilization of the area, resulting in its further deterioration and added costs to the taxpayer for the creation of new public facilities and services elsewhere.

"(9)   Property of an assessed valuation of insufficient amount to permit the establishment of a local improvement district for the construction and installation of streets, walks, sewers, water and other utilities.

"(10)   Lands within an industrial area which are not devoted to industrial uses but which are necessary to industrial development within the industrial area.

"(11)   Lands acquired by the state of Minnesota by forfeiture for non-payment of taxes."

The powers of the Authority with respect to industrial development districts, in so far as they are pertinent to the controversy herein, are as follows:

Section 458.192 provides:

"Subdivision 1.   * * * to accomplish the purposes set forth in subdivision 1 of section 458.191, [the port authority] shall have such additional powers as hereinafter described in subdivisions 2 through 10 of this section.

"Subd. 2.   It may acquire by lease, purchase, gift, devise, or condemnation proceedings all necessary right, title and interest in and to lands and buildings required for the purposes contemplated in the creation of such industrial development districts and pay therefor out of funds obtained by it as hereinafter provided, and hold and dispose of the same subject to the limitations and conditions herein prescribed. * * *

"Subd. 3.   It may exercise the right of eminent domain * * * for the purpose of acquiring any property which it is authorized to acquire by condemnation.

                    *     *     *     *     *

"Subd. 10.   Such port authority shall have the authority to sell or

lease the land held by it for river, harbor or industrial development in industrial development districts. It may, if proper in the public interest, construct suitable buildings or structures upon any land owned by it for the purpose of leasing the same to private persons in the further industrial development of such industrial district. It may exercise its authority, herein given, to the acquisition, development, sale or lease of single or multiple tracts of land to be developed, irrespective of size, having in mind that the purpose of Laws 1957, Chapter 8,12, is the industrial development of the district."

Section 458.195, subd. 6, provides:

·"It [a port authority] shall have the power in carrying out the provisions for which said industrial development district has been created, to develop and improve the lands within such industrial development district to make the same suitable and available for industrial uses and purposes; * * * to do any and all things necessary after the acquisition of such property to put the said property in such condition as is necessary and expedient to make it suitable and attractive as an industrial tract for industrial development thereon; to execute leases of such lands or property or any part thereof * * *."

Section 458.193 provides in part:

"Subdivision 1. In anticipation of the receipt by the port authority of payments, appropriations, rents and profits and of income from any other source and for the purpose of securing funds as needed by such port authority for the payment of the cost of property acquired and for other purposes as herein authorized, the port authority is hereby authorized to issue bonds in such principal amount as shall be authorized by the governing body of the city of the first class in which such port authority is situated. * * * such bonds may be issued and sold without submission of the question thereof to the electors of such city of the first class * * *.

\* \* \* \* \*

"Subd. 4. The bonds shall be secured by the pledge of the full faith, credit and resources of the city of the first class in which said port authority has been created. * * * The propriety of the issuance

of bonds in any specific case and the amount thereof shall be a matter of decision for such governing body in the first instance. * * * Such bonds shall be paid, both in the principal amount thereof and the interest thereon, by the port authority from tax levies as hereinafter provided for the purpose of repayment, the earnings and all income received by such port authority from whatever source it may be derived."

Section 458.194, subd. 1, provides:

"The authority is hereby authorized and empowered to provide by resolution for the issuance at one time, or in series from time to time, of revenue bonds of the authority for the purpose of providing funds for paying the cost of the acquisition of land necessary for the operations of the port authority, for the purchase, construction and operation of any port facilities, including docks, wharves, warehouses, piers and any other port terminal or transportation facility within its jurisdiction, or for paying the cost of any extensions, enlargements or improvements of any project under control of the authority. * * *"

Section 458.192, subds. 2 and 3, provide that a port authority may acquire the land and buildings to be included in any industrial development district by purchase, condemnation, or otherwise. It would appear from said provisions that the property acquired need not be "marginal" within the statutory definition and that the property within the created industrial development districts may be used either for river and harbor improvements or for industrial developments and may be sold or leased for such purposes. It further appears that a port authority may also "construct suitable buildings or structures upon any land owned by it for the purpose of leasing the same to private persons in the further industrial development of such industrial district." §§ 458.191, subd. 1, and 458.192, subd. 10.

Pursuant to the provisions of § 458.193, a port authority may issue general obligation bonds with the consent of the first-class city in which the port authority is situated for the foregoing purposes, in anticipation of the receipt of payments, appropriations, rents, and profits from its operations, but secured by a pledge of the full faith, credit, and resources of said city. Section 458.194 provides that the authority

may also issue revenue bonds for land acquisition, construction of port facilities, or "paying the cost of any extensions, enlargements or improvements of any project under control of the authority." The security for the payment of such revenue bonds is a "pledge of and lien upon the revenues of such port authority derived from the facility and [sic] to be acquired, constructed, or improved by the use of the proceeds of the bonds, and from any other facilities designated in the resolutions authorizing such bonds."

The Port Authority herein has no power to levy taxes or special assessments, but the first-class city in which the port district is located or contained may levy a tax of 15/100 of a mill for general purposes of the authority, and 35/100 of a mill for industrial development purposes. See, §§ 458.14 and 458.199.

Pursuant to § 458.191, on August 9, 1960, the Port Authority unanimously passed a resolution establishing an industrial development district which lies on the lower levels of the city of St. Paul and generally south and west of the Mississippi River. It appears that the lands included in the district are "marginal lands" as defined in the statutes. The land in the district was acquired and the sewer and water mains installed thereon from the proceeds of general obligation bonds while the cost of diking and riverfront installations contiguous or adjacent to the district was contributed by the city of St. Paul and the Federal government, except a portion thereof which was paid by the Authority. Several industrial parks were then platted within the district. The property involved herein, known as the "demised premises," is located in the Riverview Industrial Park on the block between Fillmore Avenue and Fairfield Avenue to the north and south respectively, and Eaton Avenue and South Robert to the east and west respectively, approximately 700 feet from the Mississippi River. The premises measure 260 feet by 279 feet.

On June 20, 1963, the Port Authority adopted a resolution providing for the issuance of revenue bonds to finance the construction of improvements on the demised premises and approving a lease of said premises and improvements to American Hoist & Derrick Company. The primary provisions of the lease are: (1) The demised premises

and improvements are leased to American Hoist & Derrick Company for a term of 30 years, the tenant having the right to renew the lease for two additional 30-year terms. (2) The Port Authority will pay the cost of preliminary and detailed construction plans as well as the cost of preparing the site. (3) The Port Authority will advertise for bids on the construction of the improvements. (4) The Port Authority and American Hoist & Derrick Company will approve or disapprove a construction contract, and, if approved, the Port Authority will sign the contract. (5) The Port Authority will sell its revenue bonds up to an amount not exceeding $1,200,000 to pay the construction cost of the improvements. (6) Each quarter American Hoist & Derrick Company will pay to the Port Authority $1,924.71 as rent for the demised premises, and 1/120 of the principal and interest to become due on the revenue bonds as rent for the improvements. If the lease is renewed the rent during the first term will be $1,633.15 a quarter and $1,814.50 a quarter during the second term. (7) American Hoist & Derrick Company will pay taxes, special assessments, fees, and charges levied or imposed on the premises. (8) The Authority will not be liable to American Hoist & Derrick Company or others for claims arising out of the use or occupancy of the premises; the company will insure the premises against fire and other risks, including public liability, and will indemnify the Authority for loss on account of claims arising out of the use of the premises. (9) American Hoist & Derrick Company will maintain the premises in good repair, the lease being a "net" lease "intended to assure Landlord the rent on an absolute net basis."

The American Hoist & Derrick Company occupies a considerable area in what has been termed "Riverview Industrial Park," located between the Mississippi River and Fillmore Avenue. It is engaged primarily in manufacturing activities. Its products are generally transported by railroad although heavy products are sometimes shipped by barge on the river.

Errors assigned by defendant are that the lower court erred in denying his motion for summary judgment and in granting plaintiffs' motion for summary judgment.

The question presented is whether it is unconstitutional for a port

authority created under Minn. St. c. 458 to lease marginal land and a building to be erected thereon to a private manufacturing corporation for use as an office building and for other purposes, such land having been acquired with tax money and such building to be financed by revenue bonds of the authority which will be payable solely from rents specified in the lease agreement.

We gather from the record that prior to the acquisition of the demised premises by the Port Authority these were improperly platted, held in divided ownership, inadequately diked, and not served by proper streets, sewer, or water facilities. The parties to this suit agree that it was marginal land as defined by § 458.191, subd. 4.

Defendant contends that the lease is authorized by c. 458 but that there are constitutional objections to the lease of the facilities in question. He points particularly to the borrowing of money by the Port Authority, as agreed in the lease, to construct a building on land purchased with taxpayers' money for sole use by the American Hoist & Derrick Company as an office building. He further states that there are no decisions of the Minnesota Supreme Court which are sufficient to overcome such objections.

Activities similar in type to those culminating in the contract in this instance have become familiar in some sections of the country and to a certain degree, depending upon fact situations and conditions, in Minnesota. We refer to the creation of a public authority and the purchase by such authority with public funds of blighted or uneconomically marginal land, the development thereof with public funds, the sale thereof to private parties for uses such as low-income housing, and perhaps the erection of facilities on the land leased to a tenant. Since Minnesota in recent years has decided a number of cases favorable to this type of activity, it is urged by the Authority that these cases ought to govern the present situation. We have reference to Erickson v. King, 218 Minn. 98, 15 N. W. (2d) 201, involving the provisions of a law creating the Metropolitan Airports Commission; Holen v. MAC, 250 Minn. 130, 84 N. W. (2d) 282; Thomas v. Housing & Redevelopment Authority of Duluth, 234 Minn. 221, 48 N. W. (2d) 175, being the first challenge in this state to the housing authority

law raised in this court; and Visina v. Freeman, 252 Minn. 177, 89 N. W. (2d) 635, in which the laws creating and providing for the financing of the Port Authority of Duluth were challenged. We note that this court in the Visina case held that (1) construction of a port facility is a public purpose for which public money may be spent; (2) a port facility is not a work of internal improvement which the state is prohibited from carrying on (Minn. Const. art. 9, § 5); and (3) the participation by the state in financing the Authority was not a gift or loan of the credit of the state in aid of an individual, association, or corporation such as would be forbidden by Minn. Const. art. 9, § 10, because the primary purpose of the authority (to develop shipping, to control the orderly use of the port and its facilities, etc.) was public, and private interests were only incidentally benefited.

The Visina case, however, is noteworthy for having stated the following principles as controlling in cases of this type: (1) The state or its municipal subdivisions or agencies may expend public money only for a public purpose. (2) A "public purpose" is such activity as will serve as a benefit to the community as a body and which, at the same time, is directly related to the functions of government. (3) A legislative declaration of public purpose is not always controlling. In the final analysis, the courts must make the determination. (4) The mere fact that some private interests may derive an incidental benefit from the activity does not deprive the activity of its public nature if its primary purpose is public. On the other hand, *if the primary object is to promote some private end, the expenditure is illegal, although it may incidentally also serve some public purpose.*

There are other housing authority cases, such as Asch v. Housing & Redevelopment Authority, 256 Minn. 146, 97 N. W. (2d) 656, and Housing & Redevelopment Authority v. Minneapolis Metropolitan Co. 259 Minn. 1, 104 N. W. (2d) 864, which add nothing to the present discussion.

Another case which we have considered, namely, Chun King Sales, Inc. v. County of St. Louis, 256 Minn. 375, 98 N. W. (2d) 194, may be highly pertinent in considering the issues here but we find that the central issue raised in the present case was not raised in the Chun

King case. The facts surrounding the Chun King case involve an element of unusual economic distress, based upon unemployment in the St. Louis County area, and it was thought to be the only "legal basis" for the acquisition and leasing of facilities to Chun King.

In Housing & Redevelopment Authority v. Greenman, 255 Minn. 396, 96 N. W. (2d) 673, this court held that it was a public purpose for the Authority to condemn blighted or slum areas and sell them to private parties for redevelopment by private capital. In that case this court went along with the judicial opinion of the time, holding that the acquisition and clearing of blighted or slum areas completely serves a public purpose, and that a subsequent transfer to private parties is only incidental to the main public purpose.

Defendant contends that the extent of the foregoing cases is that a port authority can build and lease port or harbor facilities for use by private parties; that it can also build and lease a building for the exclusive use of a single tenant, provided such building would be an integral part of the harbor operation or would contribute thereto. He asserts, however, that the use to be made of the leased premises by American Hoist & Derrick Company would not be connected with traffic on the river, or would at the most have only a remote connection. He contends that if the utmost credence should be given to the dictum in the Chun King case, the lease in question could be justified only upon a finding that the leasing of facilities in the instant case was necessary to combat unemployment or economic distress, and there has been no such finding here.

This court in Sanborn v. Van Duyne, 90 Minn. 215, 223, 96 N. W. 41, 42, said:

"* * * Private property cannot be taken, under the Constitution and laws of this state * * * for a private use; and, if it be held that, after acquiring property for a public use, the legislature may divert it to a private use, in the manner shown in this case, it may do indirectly what it cannot do directly, and accomplish what the Constitution forbids. Any legislation authorizing such action would be clearly unconstitutional and void. * * * The trial court very properly held that the lease relied

upon by defendant is utterly void, and of no force or effect. The act of the legislature under which it was made is unconstitutional."

The defendant has cited Hogue v. Port of Seattle, 54 Wash. (2d) 799, 341 P. (2d) 171, a case strongly similar to the one at bar. The Port Authority in that case was proceeding under legislation very similar to the Minnesota law to acquire and develop an extensive area for waterways, roads, rail spurs, etc., for port facilities such as docks and storage depots, and for industrial development by sale or lease of land to provide industrial concerns. The port was authorized to levy a tax to be used exclusively for such harbor improvements and industrial development. The land involved was determined by the Port Authority to be marginal under the same definition as appears in the Minnesota law although the Seattle Port Authority could acquire any land for its purposes, whether marginal or not. In that case the levy of taxes for the acquisition and development of certain land by the port was challenged by taxpayers on the ground that the legislation was unconstitutional for reasons similar to what constitutes the challenge in the instant case. The court sustained the challenge of the taxpayers by a six to three decision, and held (54 Wash. [2d] 838, 341 P. [2d] 193):

"* * * the property owner * * * may continue to own, possess, and use his property * * * regardless of whether the state or any subdivision thereof may devise a plan for putting the property to a higher or better economic use than that to which the owner is currently devoting it. Unless the state or its subdivision can prove to the satisfaction of a court that it seeks to acquire the property for a 'really public' use * * * the owner may not be deprived of it without his consent."

It should be noted, however, that the Washington Supreme Court subsequently upheld the state's urban renewal law, distinguishing the Hogue case in Miller v. City of Tacoma, 61 Wash. (2d) 374, 378 P. (2d) 464, although four judges dissented in the Miller case.

There are numerous cases in which the Supreme Court of Minnesota has been called upon to decide whether a particular action or activity of the state or of a political subdivision of the state was lawful as against the claim that it was not for public but for private ends or pur-

poses and therefore unconstitutional. We are not attempting in this opinion to rationalize all of these cases. Similar cases have been decided on a more or less completely different basis but the lines of attack on doubtful activities or transactions in the field we are considering has been fairly consistent over the years as may be gathered from the decisions of this court in Rippe v. Becker, 56 Minn. 100, 57 N. W. 331, 22 L. R. A. 857, and the more recent case of Visina v. Freeman; *supra*. See, Coates v. Campbell, 37 Minn. 498, 35 N. W. 366, and Loan Assn. v. Topeka, 87 U. S. (20 Wall.) 655, 22 L. ed. 455.

■ The rule is that taxes may be levied, or public money spent, only for a public purpose. This rule was incorporated into the Minnesota Constitution in 1906 and reads as follows:

"* * * Taxes * * * shall be levied and collected for public purposes * * *." Minn. Const. art. 9, § 1.

An 1892 amendment to Minn. Const. art. 4, § 33, prohibited the enactment of any special law authorizing public taxation for a private purpose. However, the rule was recognized and enforced even before it appeared in the Constitution.

The following principles have been in effect in varying combinations throughout the years in Minnesota. The power of condemnation may be exercised only for public use. Minn. Const. art. 1, § 13. Minn. Const. art. 9, § 10, provides:

"The credit of the state shall never be given or loaned in aid of any individual, association or corporation * * *."

This is a limitation on the state only, not on minor subdivisions. Minnesota Sugar Co. v. Iverson, 91 Minn. 30, 97 N. W. 454.

"* * * The state shall never contract any debts for works of internal improvements, or be a party in carrying on such works * * *." Minn. Const. art. 9, § 5.

This limitation also applies only to the state and not to counties, cities, or towns. Davidson v. County of Ramsey, 18 Minn. 432 (482).

"* * * public property used exclusively for any public purpose, shall be exempt from taxation * * *." Minn. Const. art. 9, § 1.

See, Chun King Sales, Inc. v. County of St. Louis, *supra.*

■ One of the points raised in oral argument before this court was whether the matters involved herein present a justiciable controversy. As said in Arens v. Village of Rogers, 240 Minn. 386, 390, 61 N. W. (2d) 508, 513:

"The undoubted rule in this state is that a justiciable controversy must exist before the courts have jurisdiction to render a declaratory judgment regarding the constitutionality of a statute. [Citations omitted.]"

Several elements are necessary for a controversy to be justiciable. We need only discuss that element about which some doubt appears in the present case, namely, the requirement that each party to the declaratory judgment action have a tangible interest in the controversy, and whether defendant has a tangible interest in asserting that the proposed lease and revenue bond issue are neither constitutional nor lawful under c. 458.

■ We said in State ex rel. Clinton Falls Nursery Co. v. County of Steele, 181 Minn. 427, 430, 232 N. W. 737, 738, 71 A. L. R. 1190:

"* * * The better doctrine supported by the weight of authority is that an official so charged with the performance of a ministerial duty will not be allowed to question the constitutionality of such a law. This rule is based largely upon governmental policy. It rests upon the theory that the court should accept as final the acts of the legislature and discourage attacks upon them except where necessary to protect the private interests of the individual asserting invalidity and peculiarly and particularly affected thereby."

However, as we further said (181 Minn. 431, 232 N. W. 738):

"There is found among the authorities a well recognized exception to the foregoing rule when the rights of the state or the public interest are involved."[2]

Although no public interest was involved in the Clinton case, we

---

[2]See, also, Bricelyn School Dist. v. Board of County Commrs. 238 Minn. 63, 55 N. W. (2d) 602.

think there is a public interest involved in the instant case. In Loew v. Hagerle Brothers, 226 Minn. 485, 488, 33 N. W. (2d) 598, 600, where the state treasurer, as custodian of a special compensation fund, contested payments out of the fund to an employee on the ground that L. 1947, c. 247, authorizing such payment, was unconstitutional, we held:

"* * * Although ordinarily a public officer, in the absence of prejudice to a personal right, may not, as a defense for the nonperformance of a ministerial duty imposed by statute, assail the constitutionality of the statute, he may do so if a question affected with a public interest is involved. In the instant case, we have such a public interest. * * * Although the fund is not derived from taxation, but from lump sum contributions by all compensation-paying employers and their insurers, the public has an interest in safeguarding, and in securing the impartial treatment of, all employes who have become industrial casualties."

Likewise, in the case at bar we think the proposed lease and bond issue is a matter involving a public interest so as to give rise to a justiciable controversy.[3]

Turning to the merits, we shall first point out certain questions which are not before us for decision. We need not consider the constitutionality of an issuance of general obligation bonds under § 458.193 since such issuance is not presently contemplated by the Port Authority. Nor need we consider the constitutionality of the Port Authority's acquisition of the demised premises herein under Minn. Const. art. 1, § 13, which permits private property to be taken only for a public use. This issue is moot since the demised premises have already been acquired and are owned by the Port Authority. Likewise, Minn. Const. art. 9, §§ 5 and 10, are inapplicable to the instant controversy. Both of these constitutional provisions apply to state alone, not to governmental subdivisions such as the Port Authority.[4] The issue presented is whether the proposed lease and revenue bond issuance are unconstitutional be-

---

[3]See, Naftalin v. King, 257 Minn. 498, 102 N. W. (2d) 301.

[4]Visina v. Freeman, 252 Minn. 177, 89 N. W. (2d) 635; Davidson v. County of Ramsey, 18 Minn. 432 (482).

cause violative of either Minn. Const. art. 9, § 1, which provides: "Taxes * * * shall be levied and collected for public purposes," or the often-stated principle that public money can only be expended for public purposes.[5]

Since the bond issue involved herein provides for revenue bonds it is doubtful that they would become subject to art. 9, § 1. They will not constitute a debt of the city of St. Paul nor a pledge of the city's taxing power or its full faith and credit.[6] Payment of the principal and interest on the bonds is to be secured by revenues derived from the proposed lease with American Hoist & Derrick Company as well as certain revenues derived from other facilities and the Port Authority's covenant to maintain sufficient rentals, rates, and charges to produce net revenues adequate to meet the principal, interest, and reserve requirements of the revenue bonds. Taxation, therefore, does not appear to be involved, although contrary arguments have been advanced.[7]

█ But regardless of the applicability of Minn. Const. art. 9, § 1, it is well settled in this state that public money can only be expended for public purposes. This principle was established as early as 1904 prior to the adoption in 1906 of the above-quoted provisions of art. 9, § 1, in Castner v. City of Minneapolis, 92 Minn. 84, 86, 99 N. W. 361:

"The rule is well settled that the legislature is powerless to authorize the expenditure of public funds by a municipal subdivision of the state, except for a public purpose. [Citations omitted.]"

Since the proceeds of the revenue bond sale will obviously constitute

---

[5]See, Arens v. Village of Rogers, 240 Minn. 386, 61 N. W. (2d) 508; Burns v. Essling, 156 Minn. 171, 194 N. W. 404; Castner v. City of Minneapolis, 92 Minn. 84, 99 N. W. 361.

[6]See, Minn. St. 458.194, subd. 6.

[7]Among the arguments are the following: If there is a default on the revenue bonds it will be necessary to tax to avoid impairment of future credit of the Port Authority or city; leases and bond issuances must be administered by public officers whose salaries are paid out of tax money; taxation will be necessary if the city or Port Authority incurs liability, e. g., fails to maintain sufficient rentals to pay the bonds.

"public money," if the proposed lease and revenue bond issuance are to be held constitutional, it must appear that they are for a public purpose.

The provisions of Minn. St. 458.191 to 458.1991 are very broad and authorize the Port Authority to create and develop industrial districts for several purposes. The Port Authority is not simply empowered to create and develop industrial districts when such districts are reasonably necessary to the successful operation of the port. It would appear that it might exercise its power for the purpose of remedying "marginal lands"[8] within the entire city of St. Paul, whether or not such action is necessary to the successful operation of the port. And, even further, it would appear that the Port Authority has been extended powers whereby it may create and develop industrial districts for the simple purpose of establishing industrial developments in the city of St. Paul regardless of whether the land is marginal or the districts are reasonably necessary to the successful operation of the port. According to § 458.09, subd. 2, and § 458.13, the Port Authority's area of operation has been made coterminous with the city of St. Paul. Thus, the following questions arise: Which of these purposes does the Port Authority seek to accomplish by the proposed lease and revenue bond issuance? Is the contemplated purpose or purposes public? In enacting Minn. St. 458.191 to 458.1991, the legislature was most likely of the opinion that all of the above purposes constitute a public purpose. However, as said in Visina v. Freeman, 252 Minn. 177, 184, 89 N. W. (2d) 635, 643:

"* * * a legislative declaration of public purpose is not always controlling. The determination of what is and what is not a public purpose, or the performance of a governmental function, initially is for the legislature, but in the final analysis it must rest with the courts."

No testimony was presented in the trial court. Judgment was entered upon plaintiffs' motion for summary judgment. We think this was error. It is well settled that a motion for summary judgment should be granted only when there is no genuine issue as to a material

---

[8] As defined by § 458.191, subd. 4.

fact.[9] We think numerous genuine issues exist, which were not litigated at the trial court level—facts which are material to a determination of whether the proposed lease and revenue bond issuance are for a public purpose. The record is not only unclear with regard to the purpose the Port Authority intends to accomplish by the proposed lease and revenue bond issuance; it is also devoid of facts which are material to determining whether the contemplated purpose is, in actuality, public. As indicated above, §§ 458.191 to 458.1991 seem to empower the Port Authority to create and develop industrial districts in the city of St. Paul for any of three purposes. We do not, in this opinion, intend in any way to pass upon the public nature of any of these purposes. We do hope, however, to set forth some of those facts which appear material to any determination that such purposes are public.

If the proposed lease and revenue bond issuance are considered necessary to the successful operation of the port itself, testimony should be presented as to the necessary relationship between the successful operation of the port and the industrial development of the surrounding area, and particularly the demised premises herein. Testimony should be presented as to the need for public rather than private financing of improvements. If the purpose contemplated by the Port Authority is the reclamation of marginal lands, evidence should be submitted as to the specific characteristics of the land which cause it to be marginal. Is public health and welfare involved? Is there a lack of interest on the part of private capital to undertake this type of development, as it applies to the marginal lands of the port area? Again, testimony should be presented as to the necessity of constructing improvements on the land through public financing rather than private in order to rectify the marginal nature of the lands here involved.[10] If the purpose of the Port Authority is simply to attract industry to the city of St. Paul,[11] testimony should be presented as to economic needs of the community,

---

[9]See, generally, 10 Dunnell, Dig. (3 ed.) § 4988b.

[10]See, § 458.191, subd. 2(4).

[11]See, generally, Pinsky, *State Constitutional Limitations on Public Industrial Financing: An Historical and Economic Approach,* 111 U. of Pa. L. Rev. 265.

i. e., whether there are depressed areas and unemployment, as well as the economic benefits expected to result from the proposed lease and its overall plan of industrial development. Once more, the need for public financing, rather than private, should be explained and litigated.

The foregoing are some of the facts which we consider material to a determination of whether the proposed lease and revenue bond issuance are for a public purpose. Since these facts were not litigated in the trial court, the judgment must be reversed and remanded for taking and submitting testimony in full compliance with the suggestions herein contained. The parties herein have done an excellent job in briefing the law applicable to the case. Hopefully, necessary facts, if available, will now be presented to enable this court to render a decision based upon fully litigated fact issues and the law applicable to those particular facts as well as the specific situation presented on this appeal.

Reversed and remanded accordingly.