MINNESOTA HOUSING FINANCE AGENCY v.
ROLLAND F. HATFIELD.

210 N. W. 2d 298.

August 17, 1973—No. 44111.

156

*Trench, Ericson, MacGregor, Lohmann & O'Brien* and *Dudley C. Ericson,* for appellant.

*Warren Spannaus,* Attorney General, *Leonard, Street & Deinard,* and *George Reilly,* for respondent.

KNUTSON, CHIEF JUSTICE.

This is an appeal from a summary declaratory judgment involving the constitutionality of L. 1971, c. 702 (Minn. St. c. 462A). The act involves a comprehensive plan "to facilitate the construction and rehabilitation of housing projects for families of low and moderate income by providing for mortgage loans, development loans, and technical assistance to qualified housing sponsors to be used for construction and rehabilitation." The act creates the Minnesota Housing Finance Agency, hereinafter MHFA, to administer the act and prescribes the powers and duties of such agency. It authorizes the agency to issue bonds and other obligations, provides for the terms and security thereof and the means to pay such bonds and other obligations and interest thereon, and authorizes the agency to grant "seed money" or temporary loans to "nonprofit" sponsors for the planning and commencement of the housing projects contemplated by the act.

The rationale for the statute is stated in Minn. St. 462A.02, subd. 1, as follows:

"It is hereby found and declared that as a result of public actions involving highways, public facilities and urban renewal activities, and as a result of the spread of deteriorated housing and blight to formerly sound urban and rural neighborhoods, and as a result of the inability of private enterprise and investment to produce without public assistance a sufficient supply of decent, safe and sanitary residential dwellings at prices and rentals which persons and families of low and moderate income can afford, there exists within the state of Minnesota a serious

shortage of decent, safe and sanitary housing at prices or rentals within the means of persons and families of low and moderate income."

The act is lengthy, and a summary of its provisions should suffice for the purpose of this decision. Subd. 2 of § 462A.02 declares that this housing shortage "is inimical to the safety, health, morals and welfare of the residents of the state and to the sound growth and development of its communities." An adequate supply of a variety of housing serving people of all income levels is declared to be essential to the growth and prosperity of the state. Subds. 3 and 4 state that the present patterns of housing in the state limit the ability of private industry to provide sufficient financing for low and moderate income housing and that Federal housing assistance programs are insufficient to meet the housing needs of low- and moderate-income families.[1] The legislature further finds that sufficient housing financing

---

[1] " 'Persons and families of low and moderate income' means persons and families, irrespective of race, creed, national origin or sex, determined by the agency to require such assistance as is made available by [this statute] on account of personal or family income not sufficient to afford adequate housing, and to be eligible or potentially eligible to occupy residential housing constructed and financed, wholly or in part, with federally insured construction loans, federally insured mortgages, federally insured securities, or with other public or private assistance, and in making such determination the agency shall take into account the following: (a) The amount of the total income of such persons and families available for housing needs, (b) the size of the family, (c) the cost and condition of housing facilities available, (d) the eligibility of such persons and families to compete successfully in the normal housing market and to pay the amounts at which private enterprise is providing sanitary, decent and safe housing. In the case of federally insured mortgages with respect to which income limits have been established by any agency of the federal government having jurisdiction thereover for the purpose of defining eligibility of low and moderate income families, the limits so established shall govern * * *. In all other cases income limits for the purpose of defining low or moderate income persons shall be established by the agency in its rules." Minn. St. 462A.03, subd. 10.

will not exist without state action to increase the available private and Federal funds.

Subd. 5 declares that the MHFA created by the act will serve a public purpose by promoting the health, welfare, and prosperity of the people. Subd. 6 declares that it is also a valid public purpose to—

"* * * construct housing for low and moderate income families who would otherwise be unable to obtain adequate housing at prices or rentals they could afford and to assist in the elimination of substandard housing conditions and to prevent the recurrence of such conditions by housing persons of varied economic means and a wide range of incomes in the same developments and neighborhoods properly planned and related to public facilities and sources of employment and services to provide the necessary powers to accomplish these public purposes."

MHFA, the agency created to fulfill these purposes, consists of the state planning director, the state auditor, and three public members appointed by the governor. MHFA is specifically empowered to make, or participate in making, Federally insured construction loans and mortgage loans to sponsors of housing for low- and moderate-income persons and families, but only if it has determined that loans "are not otherwise available, wholly or in part, from private lenders upon equivalent terms and conditions." Minn. St. 462A.05, subds. 2 and 3. MHFA may also make temporary loans, with or without interest, to nonprofit sponsors of such housing to defray development costs. Minn. St. 462A.05, subd. 5. Finally, the agency may purchase Federally insured securities if the proceeds of the securities will be used for housing for families and persons of low and moderate income. Minn. St. 462A.05, subd. 4.

The agency is empowered to finance its activities by issuing negotiable bonds and notes, the bonds to mature no later than 50 years from date of issue. Minn. St. 462A.06, subd. 12, and 462A.08. The statute specifically states that these notes and bonds shall not be a debt on the state and that the face of the

bonds shall contain a statement to that effect. Minn. St. 462A.14. These bonds, as well as the property and income of the agency, are exempt from all taxation by the state or any of its subdivisions. Minn. St. 462A.19.

The sum of $250,000 was appropriated to the agency "for the purpose of this act." L. 1971, c. 702, § 25.

On February 17, 1972, MHFA adopted Resolution 72-4, agreeing to participate in the financing of a housing project under which South High Non-Profit Housing Corporation, hereinafter South High, would construct housing for families and persons of low and moderate income. The financing plan was that Shelter Mortgage Corporation (Shelter) would lend $616,100.90 to South High as a construction loan. Shelter would then sell 90 percent of the loan, and of all additional construction loans, to MHFA. To finance this purchase from Shelter, MHFA was to sell tax-exempt Housing Development Notes. The first $500,000 of these notes were to be sold to the First National Bank of Minneapolis and the remainder were to be sold after advertising for bids. These notes are salable at an interest rate less than the rate for equivalent taxable notes, and Shelter has agreed to pass this saving on to South High so that South High will receive a construction loan on terms otherwise unavailable from private lenders. Under similar provisions, MHFA further agreed to make a long-term Federally insured mortgage loan to South High for up to $4,500,000 under § 236 of the National Housing Act.

In connection with this transaction, defendant, as secretary of the agency, was directed to execute the participation agreement with Shelter; print, execute, and deliver the first $500,000 of Housing Development Notes to the First National Bank of Minneapolis; and advertise for bids on the remainder of the notes. Because of doubts as to the constitutionality of Minn. St. c. 462A, defendant, Rolland F. Hatfield, MHFA's secretary, refused to take these actions.

The second transaction directly involved in this action was an agreement with Greater Minneapolis Metropolitan Housing Cor-

poration (Metro), a nonprofit corporation, to participate in "seed money" loans to cover the development costs of sponsors of housing construction for families and persons of low and moderate income. MHFA agreed to purchase from Metro up to 20 percent of the amount loaned to each sponsor, subject to the limits of $4,000 per sponsor and a total participation of $20,000 outstanding at any one time. These loans were to be made only to nonprofit sponsors eligible for Federally insured construction and mortgage loans. The money for these loans was to come from the $250,000 appropriated to the agency. Because of doubts as to the constitutionality of Minn. St. c. 462A, defendant refused to execute this agreement.

MHFA brought this action seeking a declaratory judgment that the act is constitutional and valid and that defendant as secretary of MHFA is empowered and obligated to perform certain ministerial duties pursuant to the resolutions adopted by MHFA. In support of a motion for summary judgment, MHFA submitted 22 affidavits with 600 pages of exhibits. The trial court granted the motion after making exhaustive and extremely helpful findings of fact containing detailed references to the exhibits and affidavits. Apparently, defendant does not challenge these findings.

The major findings of the court were that there is a serious shortage of adequate housing within the means of low- and moderate-income residents of Minnesota. The overall effective vacancy rate for Minnesota housing is 2.5 percent; a minimum 3-percent vacancy rate is necessary to avoid inflation caused by undersupply. Additionally, in the last 10 years the number of households in the state increased 1½ times as fast as the number of new units of housing.

Housing costs are increasing so rapidly in the state that one-half to two-thirds of families are unable to purchase housing without devoting more than the recommended 25 percent of their income to it. The principal components of housing costs are land, materials, labor, financing, overhead, and profit; only financing

costs can be easily and significantly reduced by government subsidy.

The issues raised by this appeal are: (1) Are the notes and bonds to be issued by MHFA debts of the state contracted in violation of Minn. Const. art. 9, §§ 6 and 7? (2) Will activities of MHFA violate Minn. Const. art. 9, § 5, which prohibits the state from becoming "a party in carrying on works of internal improvement"? (3) Do the loans made as "seed money" out of tax money and the participation in financing of housing for families and persons of low and moderate income violate Minn. Const. art. 9, §§ 1 and 10? (4) Did the court err in granting summary judgment?

■ Art. 9, § 6, provides:

"Subd. 1.  The state may contract public debts, for which its full faith, credit, and taxing powers may be pledged, at such times and in such manner as shall be authorized by law, but only for the purposes and subject to the conditions stated in this section.

\* \* \* \* \*

"Subd. 4.  Public debt other than certificates of indebtedness authorized in subdivision 3 shall be evidenced by the issuance of the bonds of this state. All bonds issued under the provisions of this section shall mature within not more than 20 years from their respective dates of issue \* \* \*."

Art. 9, § 7, provides:

"The state shall never contract any public debt, unless in time of war, to repel invasion or suppress insurrection, except in the cases and in the manner provided and referred to in the sixth section of this article. Public debt includes any obligation payable directly, in whole or in part, from a tax of state-wide application on any class of property, income, transaction or privilege, but does not include any obligation which is payable from revenues other than taxes."

This issue can be easily disposed of since the debts created by

MHFA, the Housing Development Bonds, are not "payable directly, in whole or in part, from a tax of state-wide application" but solely from the revenues paid by the owners of the projects MHFA finances. The statute sets out detailed requirements for the establishment of bond and loan funds which are to be used to repay the loans and specifically states that the bonds are not debts or liabilities of the state. Additionally, the specific notes at issue state on their face that the bonds are repayable "solely from the South High Construction Loan Account" and are not debts of the state.

Our attention has not been called to any case directly involving this issue so far as the issuance of bonds of the state or its immediate agency are concerned. However, in actions involving the University and other governmental subdivisions, we have applied the rule that bonds do not constitute a "debt" if they are to be paid solely out of earnings or income. Thus, in the case of Fanning v. University of Minnesota, 183 Minn. 222, 236 N. W. 217 (1931), we held that no state debt was contracted within the meaning of art. 9, §§ 5 to 9, by the sale of bonds to build a dormitory at the University, when such bonds were to be paid solely out of earnings.

In Williams v. Village of Kenyon, 187 Minn. 161, 244 N. W. 558 (1932), we held that the village did not create a debt within the statutes limiting the amount of permissible debt when it purchased equipment, the price of which was to be paid from the earnings of a generating plant to be constructed by the village.

Other states have consistently held that revenue bonds which specifically deny any liability of the state do not constitute state debt within the meaning of provisions similar to Minn. Const. art. 9, §§ 6 and 7. Walker v. Alaska State Mtge. Assn. 416 P. 2d 245 (Alaska, 1966); New Jersey Mtge. Finance Agency v. McCrane, 56 N. J. 414, 423, 267 A. 2d 24, 29 (1970); Martin v. North Carolina Housing Corp. 277 N. C. 29, 53, 175 S. E. 2d 665, 679 (1970); Maine State Housing Authority v. Depositors Trust Co. 278 A. 2d 699, 706 (Maine, 1971). In light of the clear lan-

guage of Minn. Const. art. 9, § 7, the bonds and notes involved here do not constitute a debt of the state.

■ Art. 9, § 5, provides:

"The state shall never be a party in carrying on works of internal improvements, except as authorized by this Constitution * * *."

Historically, this provision of the Constitution has been given a fairly limited reading. First, § 5 has been held to apply only to the state, not to its political subdivisions. Davidson v. County of Ramsey, 18 Minn. 432 (482) (1872); Visina v. Freeman, 252 Minn. 177, 89 N. W. 2d 635 (1958); Port Authority of City of St. Paul v. Fisher, 269 Minn. 276, 132 N. W. 2d 183 (1964). Additionally, this court has long held that the provision does not apply to works of the state in its governmental, as opposed to proprietary, functions. Rippe v. Becker, 56 Minn. 100, 57 N. W. 331 (1894); Erickson v. King, 218 Minn. 98, 15 N. W. 2d 201 (1944); Visina v. Freeman, *supra;* Minnesota Pollution Control Agency v. Hatfield, 294 Minn. 260, 200 N. W. 2d 572 (1972). The rationale for the latter exception was discussed in historical terms in Erickson (218 Minn. 103, 15 N. W. 2d 203):

"A reading of the debates in the constitutional convention or conventions which framed our constitution leads us to believe that the evil sought to be prevented by * * * art. 9, § 5, * * * was that of the state's financing railroads, toll roads, or canals, all of which lend themselves readily to operation for profit by private corporations and are not well carried on by public officers."

While this statement may appear to include housing in forbidden internal improvements, Visina, discussing the establishment of the Port Authority of Duluth, points out that the categories of allowable and forbidden state activities are not static (252 Minn. 193, 89 N. W. 2d 648):

"While the plain meaning of language used in our fundamental law may not be tampered with to accomplish a desired result no

matter how archaic it has become by virtue of social and economic changes which have occurred since its adoption, neither should the proper interpretation of constitutional provisions ignore such changes. In determining whether an act of the legislature contravenes a constitutional provision we should endeavor to interpret the provision in the light of existing conditions, particularly when those conditions could not have been foreseen at the time the constitution was adopted. If the Great Lakes-St. Lawrence Seaway had been a reality instead of a dream when our constitution was adopted, it can hardly be supposed that the framers of our constitution, and the people who adopted it, would have proscribed the expenditure of public money to improve harbor and dock facilities to enable our state to have contact by water transportation with all other ports of the world. The limitation on spending public money for internal improvements obviously was not intended to circumscribe such activity. In a true sense, the development of a seaport to facilitate water transportation between our state and other ports of the world is not an internal improvement at all. While we held that the term 'internal improvements' includes any public improvement in Rippe v. Becker, 56 Minn. 100, 57 N. W. 331, 22 L. R. A. 857, it must be kept in mind that, in discussing the term, we did not there have in mind any such thing as the development of a seaport. It seems to us that such improvement could not have been within the contemplated meaning of this constitutional proscription, nor would it be proper to so construe the constitution as to include it within the meaning of 'internal improvements.'

"While this case may illustrate the need for some constitutional revision, the fact remains that the right to amend the constitution rests with the people and should not be usurped by the courts in the guise of judicial interpretation. At the same time, when it becomes necessary to interpret the provisions of the constitution in the light of conditions which exist today that could not be contemplated at the time our constitution was adopted, we should attempt to give to it a reasonable meaning as ap-

plied to present conditions if that can be done without doing violence to the expressed language used in the constitution itself. If the language of the constitution permits, we should give to it that meaning which would have been expressed when adopted if the present conditions that are involved had then existed or had been within the contemplation of those who drafted the instrument."

Since the earliest cases, some of the most clearly accepted governmental functions are "education, the prevention of crime, charity, and the preservation of the public health." Rippe v. Becker, 56 Minn. 100, 117, 57 N. W. 331, 335 (1894). Later cases upheld the control of tuberculous cattle, Schulte v. Fitch, 162 Minn. 184, 202 N. W. 719 (1925); state fishing operations intended to preserve fish as a food supply, Lipinski v. Gould, 173 Minn. 559, 218 N. W. 123 (1938); and a Depression job program employing needy persons in flood control, water supply, and water diversion, Moses v. Olson, 192 Minn. 173, 225 N. W. 617 (1934), as governmental functions within the exception to art. 9, § 5.

In the case now before us, the financing of housing for persons of low and moderate income comes within the type of activities permitted in the cases cited above. In its findings of fact, the trial court found that a great number of housing units in the state had inadequate plumbing, heating, or kitchen facilities. These problems were more severe in the area where the South High project is to be built than in Minneapolis as a whole. The South High area suffers from a great number of dilapidated and deteriorated buildings, severe overcrowding, and a disproportionate number of elderly and low-income persons who are unable to purchase suitable housing without devoting an inordinate amount of their income to housing. These findings support a conclusion that the plan meets the accepted governmental function of protecting public health.

■ Art. 9, § 1, provides:

"The power of taxation shall never be surrendered, suspended

or contracted away. Taxes * * * shall be levied and collected for public purposes * * *."

Art. 9, § 10, provides:

"The credit of the State shall never be given or loaned in aid of any individual, association or corporation * * *."

The application of both of these sections has been based on whether or not the extension of credit or tax exemption is for a public purpose. See, e.g., City of Pipestone v. Madsen, 287 Minn. 357, 178 N. W. 2d 594 (1970). The general principles for such a determination are set out in Port Authority of City of St. Paul v. Fisher, 269 Minn. 276, 288, 132 N. W. 2d 183, 192 (1964):

"* * * (1) The state or its municipal subdivisions or agencies may expend public money only for a public purpose. (2) A 'public purpose' is such activity as will serve as a benefit to the community as a body and which, at the same time, is directly related to the functions of government. (3) A legislative declaration of public purpose is not always controlling. In the final analysis, the courts must make the determination. (4) The mere fact that some private interests may derive an incidental benefit from the activity does not deprive the activity of its public nature if its primary purpose is public. On the other hand, *if the primary object is to promote some private end, the expenditure is illegal, although it may incidentally also serve some public purpose.*" (Citing Visina v. Freeman, 252 Minn. 177, 89 N. W. 2d 635 [1958]).

Plaintiff argues with some force that the public purpose question is controlled by Thomas v. Housing & Redevelopment Authority of Duluth, 234 Minn. 221, 48 N. W. 2d 175 (1951). This case upheld the constitutionality of the Municipal Housing Aid Redevelopment Act, Minn. St. 462.11, et seq., establishing low-rent housing developments for public housing and slum clearance purposes. Finding a public purpose in furnishing public housing

independent of the slum clearance value, the court stated (234 Minn. 240, 48 N. W. 2d 187) :

"* * * [T]he existence in any community of families who are unable to acquire suitable housing accommodations for themselves because their incomes are so low that the rentals they are able to pay are not attractive to the construction of dwellings by private capital for rental purposes creates a problem in modern society which affects the welfare not only of such persons but of the entire community. * * *

* * * * *

"Providing housing accommodations for persons of low income under conditions contemplated in the act affords additional reasons why the legislature properly could direct the authority to condemn real estate in order to acquire a site for such housing accommodations, even though the site may be separate and some distance from the slum dwellings for which such new accommodations are established as a substitute."

The major difference between the statute under consideration in the instant case and that upheld in Thomas is that we now are called upon to consider provisions for construction of housing for families or individuals with moderate incomes as well as for those with low incomes. This distinction is more a product of the changing conditions, however, than of a change in the "public" nature of the activity. This concept of evolving public uses was recognized in State ex rel. Twin City B. & I. Co. v. Houghton, 144 Minn. 1, 174 N. W. 885 (1919), 144 Minn. 13, 16, 176 N. W. 159, 161 (1920) :

"The notion of what is public use changes from time to time. Public use expands with the new needs created by the advance of civilization and the modern tendency of the people to crowd into large cities. Such a taking as here proposed could not possibly have been thought a taking for public use at the time of the adoption of our Constitution when the state was practically a wilderness without a single city worthy of the name. 'The term

"public use" is flexible, and cannot be limited to the public use known at the time of the forming of the Constitution.' Stewart v. Great Northern Ry. Co. 65 Minn. 515, 68 N. W. 208, 33 L.R.A. 427. What constitutes a public use at the time it is sought to exercise the power of eminent domain is the test. The Constitution is as it was when adopted, but, when it employs terms which change in definition as conditions change, it refers to them in the sense in which they are meant when the protection of the Constitution is sought."

Accord, Housing & Redevelopment Authority of St. Paul v. Greenman, 255 Minn. 396, 96 N. W. 2d 673 (1959).

When, as the trial court found, the cost of housing has risen so that even moderate-income families find themselves priced out of the housing market, it would seem that the instant case falls fully within the public purpose found in Thomas v. Housing & Redevelopment Authority of Duluth, *supra.*

Additionally, the following findings of fact, supported by affidavits to which the court refers, offer an independent rationale for holding that financing of housing for families and persons with low *and moderate* incomes is a valid public purpose:

"When there is too high a concentration of low income families in a neighborhood, the neighborhood is more likely to deteriorate into slum-like conditions than a neighborhood having a more varied economic mix. *Affidavits of Paul T. Fuchs, Philip G. Meininger, DelRoy C. Peterson, Eugene J. Ranieri and Fred Stahl.*

"Housing projects having residents of varied economic needs are less likely to adversely affect property values or be offensive to neighbors. *Affidavits of Eugene J. Ranieri and Paul T. Fuchs.*

"An interest subsidy mechanism is perhaps the most unobtrusive method for the government to subsidize housing costs and housing so subsidized is less likely to be stigmatized with the tarnished image often associated with public housing operated by housing redevelopment authorities. *Affidavit of Robert H. Scroggins.*"

These findings demonstrate that the provision of housing for families having a moderate income may be a necessary adjunct to the typical slum clearance provision of housing for families having a low income. The failure of the Pruitt-Igoe project in St. Louis is too well known to hold that the legislature's effort to prevent the recurrence of sub-standard housing conditions "by housing persons of varied economic means and a wide range of incomes in the same developments and neighborhoods," Minn. St. 462A.02, subd. 6, is an unreasonable public goal.

This latter rationale was adopted by the Supreme Judicial Court of Massachusetts in Massachusetts Housing Finance Agency v. New England Merchants Nat. Bank, 356 Mass. 202, 249 N. E. 2d 599 (1969). Although the Massachusetts court had previously held that the provision of housing to middle-income families was not a valid public purpose, Opinion of the Justices, 351 Mass. 716, 219 N. E. 2d 18 (1966), in the Massachusetts Housing Finance Agency case the court held that the legislature could rationally find that housing for such families would aid in the financing of housing projects, avoid the creation of new slums, and lower the upkeep of housing projects by reducing tenant abuses. Thus, the court held that provision of housing for middle-income families could be viewed as merely incidental to the well-accepted public purpose of providing proper housing to low-income families.

The great majority of jurisdictions considering legislation similar to that now before this court have little difficulty in finding that the provision of adequate housing to middle-income families otherwise unable to purchase such housing is a valid public purpose. In Vermont Home Mtge. Credit Agency v. Montpelier Nat. Bank, 128 Vt. 272, 277, 262 A. 2d 445, 449 (1970), the court found:

"* * * The public necessity for safe, adequate and sufficient housing goes hand in hand with the need created by the State's growing population and industrial development. And as a matter of general notice, we recognize that rising costs of money, here

and elsewhere, have placed capital funds for home construction in critically short supply. * * *

* * * * *

"* * * [I]f the measures adopted by the General Assembly succeed in their objective to provide safe, adequate and sufficient housing, the general welfare of the State will be served."

In New Jersey Mtge. Finance Agency v. McCrane, 56 N. J. 414, 420, 267 A. 2d 24, 27 (1970), the court upheld legislation for state mortgage financing *without regard for income,* noting:

"The question of whether a citizenry has adequate and sufficient housing is certainly one of the prime considerations in assessing the general health and welfare of that body. [Citations omitted.] In the present case, the Legislature made a determination that there was 'a critical shortage of adequate housing,' that 'a large and significant number of New Jersey residents have and will be subject to hardship in finding adequate, safe and sanitary housing unless new facilities are constructed,' and that 'a major cause of this housing crisis is the lack of funds available to finance housing by the private mortgage lending institutions of the State.' * * * In these circumstances a program designed to increase housing production clearly satisfies the constitutional requirement of fostering a valid public purpose."

In Walker v. Alaska State Mortgage Assn. 416 P. 2d 245, 252 (Alaska, 1966), the court forthrightly held that "[h]ousing (and its effect upon the health, safety, welfare, comfort and security of this state's citizens) as well as the economic climate of the state are legitimate legislative purposes." Similar programs were also upheld in Martin v. North Carolina Housing Corp. 277 N. C. 29, 175 S. E. 2d 665 (1970), and State ex rel. W. Va. Housing Development Fund v. Copenhaver, 153 W. Va. 636, 171 S. E. 2d 545 (1969).

Our attention has been directed to In re Advisory Opinion, 380 Mich. 554, 158 N. W. 2d 416 (1968), which, in the context of the Michigan constitution, held that appropriations by the state di-

rectly to a housing development fund and a capital reserve sinking fund did not constitute a public purpose despite the fact that the encouragement of housing construction was a valid public purpose for a state agency to undertake. The court distinguished between a purpose that could be undertaken by an agency which would insulate the state from direct monetary involvement and one which the state could undertake by direct appropriation of money.

Although the opinion represents a distinctly minority position, it is distinguishable, since Michigan Const. art. 4, § 30, allows public moneys to be appropriated for private purposes upon the assent of two-thirds of each house. It seems only reasonable and proper that the concept of public purpose should be more stringently interpreted when the legislature may still act upon a two-thirds vote than when the proposed state action will be permanently frustrated by a judicial finding that private, rather than public, interests will be served.

We hold that Minn. St. c. 462A serves a valid public purpose.

■ Defendant's final contention is that summary judgment was improper since plaintiff had not sustained its burden "of proving the necessity of creating the Minnesota Housing Finance Agency to engage in the mortgage banking business."

The trial court's findings of fact are unusually complete and comprehensively refer to the affidavits submitted to it. Defendant does not challenge these findings and we hold they are amply supported by the evidence.

Defendant apparently contends that inasmuch as the parties have not stipulated to the facts he has a right to trial in order to cross-examine plaintiff's affiants and introduce additional testimony. Rule 56.05, Rules of Civil Procedure, expressly provides that when a motion for summary judgment is made and supported by affidavits, "an adverse party may not rest upon the mere averments or denials of his pleading but must present specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall

be entered against him." Defendant has presented no affidavits, depositions, or other documents controverting plaintiff's affidavits. He simply claims that additional facts might have been developed at the trial. We have consistently held that this is not enough. Rosvall v. Provost, 279 Minn. 119, 155 N. W. 2d 900 (1968) ; Borom v. City of St. Paul, 289 Minn. 371, 184 N. W. 2d 595 (1971) ; Ahlm v. Rooney, 274 Minn. 259, 143 N. W. 2d 65 (1966) ; Callender v. Kalscheuer, 289 Minn. 532, 184 N. W. 2d 811 (1971) ; Morgan v. McLaughlin, 290 Minn. 389, 188 N. W. 2d 829 (1971) ; County of Hennepin v. Mikulay, 292 Minn. 200, 194 N. W. 2d 259 (1972). See, 2 Hetland & Adamson, Minnesota Practice, Civil Rules Ann., p. 572.

Under the rule followed in all of these cases, summary judgment was proper.

A more serious claim might be based upon the case of Port Authority of City of St. Paul v. Fisher, 269 Minn. 276, 132 N. W. 2d 183 (1964). There, the court held that summary judgment was improper where the record was unclear as to which of three statutory purposes the Port Authority sought to accomplish by a proposed lease and revenue bond issuance. Defendant also refers to Ault v. Alaska State Mtge. Assn. 387 P. 2d 698 (Alaska, 1963), where the court held summary judgment inappropriate in a case challenging a statute similar to c. 462A.[2] In that case, the court described the procedure in the lower court as follows (387 P. 2d 701) :

"* * * The appellant made numerous allegations of illegality and supported them with no evidence whatsoever. The appellees supported their motion for summary judgment with an affidavit containing approximately six conclusions and two statements of fact. Counsel then attempted to provide in a very general way, in argument, the factual background that should have been supplied by evidence."

[2] The statute was subsequently held constitutional in Walker v. Alaska State Mortgage Assn. 416 P. 2d 245 (Alaska, 1966).

Both of the above cases are readily distinguishable from the instant case. The affidavits and exhibits presented below were voluminous. The purposes of the South High and Metro transactions are clear. It is difficult to see how a trial would present the court with additional factual information. The affidavits present the support for the legislative findings of fact and policy, the working of the two transactions directly involved, and the opinion evidence that the statutory plan will be effective. The issues remaining are purely of law and not of fact.

Affirmed.

MR. JUSTICE MACLAUGHLIN took no part in the consideration or decision of this case.

MR. JUSTICE YETKA and MR. JUSTICE SCOTT, not having been members of this court at the time of the argument and submission, took no part in the consideration or decision of this case.