# PENN-O-TEX OIL COMPANY v. CITY OF MINNEAPOLIS.[1]

March 29, 1940.

No. 32,450.

*Best, Flanagan & Rogers,* for appellant.

*R. S. Wiggin,* City Attorney, and *John F. Bonner,* Assistant City Attorney, for respondent.

HOLT, JUSTICE.

Plaintiff, after having entered a 20-year lease with defendant, was advised by its attorneys that it was void and illegal and brought this action under the uniform declaratory judgments act to have the instrument adjudged void and to recover the rent paid. The city asserted its validity. The district court made findings of fact and conclusions of law, upon which a declaratory judgment was rendered decreeing the lease valid and binding on both parties. Plaintiff appeals from the judgment.

[1]Reported in 291 N. W. 131.

No question is raised as to the propriety of plaintiff's right to sue for a declaratory judgment. The evidence shows that in entering the lease plaintiff had in contemplation spending $125,000 for steel storage tanks and equipment for transferring the petroleum or oil it intended to receive from the barges that would dock. It is evident that plaintiff cannot afford to make such expenditure unless its lease is valid and binding for the full term thereof.

To give an outline of the situation, this may be stated: Many years ago the city of Minneapolis acquired lands bordering the west bank of the Mississippi River for a terminal harbor. Roughly speaking, such lands reached westerly to the top of the bluff and from Bluff street to Riverside Park. What was known as the Bohemian Flats are now the extensive coal dock north of the Washington avenue bridge. South of that bridge is a large freight warehouse and landing dock and other facilities for handling river traffic. A road leads from the docks northerly to Bluff street, also a main railroad track parallel thereto, with necessary sidetracks. A lately built road leads from the lower levee northwesterly on a curve up to Third street. The lease here in question covers a rock shelf formed after a stone quarry was exhausted. It is located east of the east line of Twenty-second avenue south and between Two-and-a-Half street and Fourth street. The lease was evidently carefully prepared by capable attorneys and surveyors, as indicated by the plat of the leased ground attached to and made part of the lease. It appears that the leased parcel is at a level some 15 to 20 feet higher than any part of the harbor, docks or wharfs, railroad tracks, or roadways below. In respect to the leased parcel, the city acquired part thereof by deeds and part by two condemnation proceedings. It is assumed that this acquisition was of the fee—not of a mere easement—for the purpose of operating a terminal harbor with the necessary dock and wharf facilities. At any rate, this lease does not affect the title of the city to the ground leased.

The city claims the power and authority to make this lease both under statute and charter provisions. The statute is L. 1913,

c. 310, §§ 1, 2 (1 Mason Minn. St. 1927, §§ 1484 and 1485). The title of the act is: "An act to authorize and empower cities in this state of over fifty thousand inhabitants to acquire, construct, own, operate and lease public utilities and to provide the means therefor." The first section (1484) names the public utilities included, and among these we find "terminal systems." It does not appear whether in acquiring these lands for a terminal harbor the city proceeded under L. 1913, c. 310, but the public utility of a terminal harbor apparently is within the named "terminal systems." The city evidently proceeded in making this lease so as to come under this provision of § 1485:

"No ordinance authorizing the lease of any public utility for any period, nor any ordinance renewing any lease, shall go into effect until the expiration of sixty days from and after its passage. And if, within said sixty days, there is filed with the clerk of such city a petition signed by ten per cent of the voters voting at the last preceding election for mayor, in such city, asking that such ordinance be submitted to a popular vote, then such ordinance shall not go into effect unless the question of the adoption of such ordinance shall first be submitted to the electors of such city and are approved by a majority of those voting thereon."

The court found that 60 days elapsed after the ordinance authorizing this lease was adopted, and that no petition had been filed with the city clerk asking the submission of the ordinance to the voters for approval.

In addition to the power conferred on the city by the above statute, it also claims the power to make the lease by virtue of § 1 of c. I of the charter:

"The City of Minneapolis * * * may * * * take and hold, lease and convey all such real, personal and mixed property as the purposes of the corporation may require, or the transaction or exigencies of the business may render convenient."

Also § 5, c. IV, the general welfare clause, and § 14, c. IV, reading:

"The City Council shall have the management and control of * * * all property of the city * * * and may provide for the sale of any such property, in such manner as it shall consider for the interest of the city."

It is quite apparent that in the acquisition of such vast quantities of land of sand flats, exhausted quarries, and steep banks for this terminal harbor there was necessarily included some considerable amount which was not needed or adapted for the project, except upon the expenditure of vast sums of money. The court upon uncontradicted evidence found:

"XII. That the real estate covered by said lease is not immediately adjacent to said Mississippi River, and consists of a small shelf of land considerably above dock level and lies directly back of the package and grain terminal; that the land is not susceptible to or needed for the use of the defendant as a public dock, nor is said land usable for the storage of coal or other bulk commodities owing to its elevation. That any attempt by the city to build structures for the storage of grain or other commodities on said land to be transported thereto from the river by means of conveyors would be impracticable because the cost would be prohibitive. That said land can be used only for the loading and unloading of liquids which may be pumped to said land back and up from the river. That it is impracticable for the defendant to erect municipally owned facilities for the loading, unloading and storage of such liquids.

"XIII. That the premises covered by said lease were originally acquired by the defendant for the purpose of operating a public dock and river terminal and such original acquisition was proper and lawful; that subsequent to its acquisition, conditions became such that said premises were no longer needed for the direct operation by the defendant of said public dock or river terminal, nor are they needed for any other public use.

"XIV. That the leasing of said premises by the defendant to the plaintiff is proper and reasonably necessary for the proper and efficient operation by the defendant of said public dock and river terminal. That the said leasing of said premises will greatly promote the business and operation of said public dock and river terminal, and that the making of said lease by the defendant to the plaintiff is within both the express and implied authority of the defendant and is a proper exercise of such authority."

The XVth finding is that the public dock and river terminal are not self-sustaining, and taxation is necessary to maintain the same, and that the rent received from this lease will by that much lighten the burden of the taxpayers. In addition to the rent from the lease, the city will receive substantial revenue from the dockage charges upon the oil or petroleum transferred from the river barges to the storage tanks of plaintiff on the leased ground. And the XVIth finding is that the use by plaintiff of the leased land will not interfere in any manner with the public dock or levee thereon, or with the trackage or other facilities now being operated by defendant on said public dock or harbor.

Under the above findings and the situation stated, it would seem unfortunate indeed if the law should prohibit the city from making this lease. It does not appear under what arrangement the coal on the coal dock is stored from the time unloaded until hauled away, or whether the right of storage is leased out by the city to one dealer or to several. Plaintiff has received a lease to a plot of ground upon which it has to expend large sums of money in order to receive and store the oil it expects to receive from the barges transporting it to the dock. Plaintiff's use of the leased ground is in a measure the same as that afforded those who unload and store the coal on the coal dock. Its use under this lease is in aid of and incidental to the proper operation of a terminal harbor.

Plaintiff cites and relies on these decisions of this court: City of St. Paul v. C. M. & St. P. Ry. Co. 63 Minn. 330, 63. N. W. 267, 65 N. W. 649, 68 N. W. 458, 34 L. R. A. 184; Sanborn v. Van

Duyne, 90 Minn. 215, 96 N. W. 41; Nerlien v. Village of Brooten, 94 Minn. 361, 102 N. W. 867; State ex rel. Ford Motor Co. v. District Court, 133 Minn. 221, 158 N. W. 240. City of St. Paul v. C. M. & St. P. Ry. Co. *supra,* involved ground dedicated by the owner and platter thereof as a levee. The case was reargued twice, and Mr. Justice Mitchell wrote the three opinions. The last of these contains language and reasoning that goes far to sustain the instant lease. It is to be noted that the city of St. Paul by ordinance undertook to give the railway company the right to erect upon the dedicated levee a large and permanent freight house, whereas here the ground marked levee is a strip 60 or 80 feet wide several feet east of and below the leased land. In this entire harbor, docks and wharfs, no parcel of ground appears to have been dedicated by the fee owner as and for a levee or for any other public purpose. It is certain that no part of the present coal dock was ever so dedicated. How the above referred to strip marked "levee" came to be so designated is not disclosed, nor does it appear how the city derived title thereto.

Sanborn v. Van Duyne, 90 Minn. 215, 96 N. W. 41, 42, was an action in ejectment and for equitable relief. The plaintiffs Sanborn conveyed to the city of St. Paul [90 Minn. 222] "all that tract or parcel of land lying and being in the county of Ramsey in the state of Minnesota described as follows, to-wit: A perpetual easement for the purpose of a public levee over and upon lots one (1) and two (2)." Nothing was done to develop the lots into a public levee, and after the enactment of Sp. L. 1891, c. 34, the city of St. Paul, by ordinance, leased the lots to one Cook, who erected a factory upon them and evidently transferred the lease to defendant, Van Duyne. This court held the lease invalid, that the legislative act could not confer on the city authority to lease an easement conveyed to the city in trust for a public use. The court also held that the Sanborns remained owners of the fee and were entitled to have the public easement conveyed to the city protected against a wrongful invasion.

Nerlien v. Village of Brooten, 94 Minn. 361, 102 N. W. 867, was an equitable suit to restrain the village and its trustees from assisting a private citizen by allowing the use of village property and assistance of a village employe in conducting a flour business in competition with Nerlien engaged in a like business. The facts there disclosed established such flagrant, unlawful practice that this court reversed a judgment in favor of defendants.

State ex rel. Ford Motor Co. v. District Court, 133 Minn. 221, 158 N. W. 240, has really no bearing upon the question involved in this appeal.

We consider that the decision in Anderson v. City of Montevideo, 137 Minn. 179, 162 N. W. 1073, 1074, sustains the lease in the case at bar. There a taxpayer and citizen of the city sought to enjoin the defendants from leasing the auditorium in the municipal building owned by the city and to enjoin the tenant from conducting a moving picture show therein. The trial resulted in a decision for defendants. This court, after stating the facts, says [137 Minn. 181]:

"The inquiry is one of power. Had the city the right to lease the auditorium as it did? True it would have no right to erect buildings primarily to rent, but if, in erecting a building for its municipal affairs, an auditorium was included in the structure, intended and designed for public gatherings, and subsequently conditions became such that the same was no longer needed for the purposes or use of the municipality, and that by leasing the same a better income would be derived and the burden of taxation lightened, we see no sound reason why it may not legally do so."

This is in harmony with these observations of Mr. Justice Mitchell in City of St. Paul v. C. M. & St. P. Ry. Co. *supra,* (63 Minn. 353, 68 N. W. 460):

"No doubt the legislature, as the representative of the public, has the power, either directly or indirectly, through the municipality, or even through a private corporation or person, to improve these premises for 'levee purposes.' It might construct, or authorize the construction and maintenance of, wharves or warehouses

thereon as aids to and conveniences for public travel and traffic to and from craft navigating the river, and impose, or authorize the imposition of, charges for the use of such structures sufficient to defray the cost of their construction and maintenance. This would not only be consistent with, but in aid of, the principal use for which the land was dedicated. The legislature might also grant, or authorize the granting, to any person or corporation having traffic with vessels on the river, the exclusive use of so much of a levee as was reasonably necessary for his or its business with such vessels,—provided it did not unreasonably interfere with the use of the levee by the remainder of the public,—until such time as the needs of the public required the termination of such exclusive use. The construction and maintenance of a permanent structure does not by any means necessarily constitute a misuse of a levee."

We think the foregoing language of Mr. Justice Mitchell so pertinent to the situation of this lease that upon the quoted findings no further argument is needed to adjudge the lease valid. If on the entire westerly rim or boundary of the city's acquired land warehouses could be erected under leases for the receipt and storage of river traffic, it certainly would be in aid of the harbor enterprise.

While statutes and charter provisions of cities differ, the following decisions seem to sustain the validity of the instant lease; Woodward v. Fox West Coast Theaters, 36 Ariz. 251, 284 P. 350; Kansas City v. Board of Co. Commrs. 117 Kan. 141, 230 P. 79; Inland Waterways Co. v. City of Louisville, 227 Ky. 376, 13 S. W. (2d) 283; State v. Board of Commrs. 153 La. 664, 96 So. 510; D. N. Kelley & Son, Inc. v. Selectmen of Fairhaven, 294 Mass. 570, 3 N. E. (2d) 241; Lindburg v. Bennett, 117 Neb. 66, 219 N. W. 851. See also the extensive annotations in 63 A. L. R. 614 to 631.

We are of the opinion that the lease is valid and binds both parties thereto according to its terms.

The judgment is affirmed.