# CITY OF PIPESTONE AND OTHERS v.
# IVAN MADSEN.

178 N. W. (2d) 594.

June 19, 1970—No. 42314.

*Gislason, Alsop, Dosland & Hunter* and *S. P. Gislason,* for appellant.

*Dorsey, Marquart, Windhorst, West & Halladay, William J. Hempel,* and *Robert A. Schwartzbauer,* for respondents.

*Robert C. Rice,* for respondents other than Pawnee Corporation.

*Scott, Vorhees & Reutter* and *William P. Scott,* for respondent Pawnee Corporation.

*Douglas M. Head,* Attorney General, *Richard H. Kyle,* Solicitor General, and *Richard A. Emerick,* Special Assistant Attorney General, for State of Minnesota, Department of Economic Development, amicus curiae.

NELSON, JUSTICE.

This case was brought to establish the validity of the action of the city of Pipestone, Minnesota, a municipal corporation, and of members of the city council of said city to effect the sale of $3,000,000 in revenue bonds to finance the purchase of land located near the city and the erection of a meat packing plant thereon. Defendant, the mayor of the city, contends that the statute under which the city council has proceeded, Minn. St. c. 474, the Minnesota Municipal Industrial Development Act, is unconstitutional.

The Municipal Industrial Development Act (hereinafter referred to as Act), passed in 1967 by the Minnesota Legislature, authorizes municipalities and redevelopment agencies to (1) acquire, construct, and hold land, buildings, and improvements thereon deemed necessary to a project to be situated within the state; (2) issue revenue bonds, repayable solely from revenues of such project to finance the acquisition, construction, or improvement of such project; (3) lease such project to any person, firm, or public or private corporation in such a manner that rents from the lease provide revenue sufficient to pay the principal and interest on revenue bonds issued by a municipality; (4) pledge and assign to the holders of such bonds or a trustee therefor the revenues of such project; and (5) mortgage or otherwise encumber such project without obligating itself except with respect to the project. Minn. St. 474.03.

Other provisions of the Act pertinent to the instant case may be summarized as follows:

Section 474.01 delineates the policies and purposes of the Act and provides that the commissioner of economic development shall assist and advise municipalities in furtherance of these purposes. This section will be discussed later in detail.

Section 474.04 provides that the acquisition, construction, or improvement of any project and the issuance of bonds pursuant thereto may be authorized by an ordinance or resolution of the governing body of the municipality.

Section 474.09 lists certain covenants which may be contained in the ordinance or resolution authorizing the issuance of revenue bonds, such as the rents to be charged for use of the properties involved, the creation and maintenance of sinking funds, the insurance to be carried on the project, and procedures for amending the ordinance or resolution.

While § 474.10 was amended by the legislature in 1969,[1] for purposes of this action Minn. St. 1967, § 474.10, governs. That section provides that the revenue bonds shall not be payable from nor charged upon any funds other than the revenue pledged to the payment thereof, nor shall the municipality issuing the bonds be subject to any liability thereon. The section further provides that the bonds shall not constitute a charge, lien, or encumbrance upon any property of the municipality except those projects mortgaged or otherwise encumbered under the provisions and for the purposes of the Act. The section also provides that the revenue bonds shall not constitute debts of the municipality within the meaning of any statutory or constitutional limitation.

The facts in this case indicate that on February 17, 1969, in compliance with § 474.01, subd. 7, the city council of the city of Pipestone obtained approval from the commissioner of economic development of a proposed industrial revenue bond project in which a packing plant was to be constructed and leased to plaintiff Pawnee Corporation.

---

[1] L. 1969, c. 1061, § 2.

On February 18, 1969, the city council passed a resolution authorizing the acquisition, construction, and leasing of the proposed project and the issuance of industrial development first mortgage revenue bonds in an amount up to $3,000,000 to finance the project. The bonds were to be secured by a pledge and assignment of the revenues of the project and a mortgage of the project to a trustee, all for the purpose of providing an industrial site for the operation by Pawnee Corporation of a meat packing business.

In contemplation of the above resolution, Pawnee Corporation, under authorization of its board of directors, tendered a warranty deed covering the 109 acres of land constituting the project site and a lease to the city of Pipestone for execution. The warranty deed conveyed the project site to the city of Pipestone. The lease between the city and Pawnee Corporation, as tenant, was to run for a period of 20 years, and provided that the basic rentals were to be equal to the sum of the interest and principal due on the then succeeding interest payment date on the industrial development first mortgage revenue bonds issued by the city. The rentals also were to include all taxes and special assessments levied on the project or on the privilege of using the project. The lease is considered an absolute "net" lease. The bonds are not payable from nor charged upon any funds other than the rentals. The mortgage and indenture of trust to be entered into between the city of Pipestone and First Trust Company of St. Paul, as trustee, pledged the revenues and mortgaged the project site, buildings, and improvements in capital equipment as security for payment of up to $3,000,000 in industrial development first mortgage revenue bonds. The provisions contained in the lease and mortgage and indenture of trust are authorized by and consistent with the provisions of the Act.

The cost of the packing plant is estimated at $2,750,000. The remaining revenue from the bond issue would be used as additional site preparation and placement fees.

When put into operation, the plant will provide employment

for approximately 100 persons and will generate a payroll estimated at $710,000. This in turn may create the need for 3 new retail establishments and an additional 65 jobs in service-related industries to accommodate the 100 jobs actually provided by the project. It is expected that the project would cause an estimated 2.8-million-dollar increase to the economy. Based on the 1969 total mill rate, the project is expected to generate over $64,000 in present annual taxes to be divided among the Jasper school district, Aetna Township, and Pipestone County.

Pawnee Corporation asserts that private financing for this project is not available and the board of directors admits that it will not consider building the plant unless public revenue bond financing is available.

When presented with the resolution of the city council authorizing the project and the proposed lease and mortgage and indenture of trust, defendant, the mayor and a council member of the city of Pipestone, refused to execute such instruments on behalf of the city. Such refusal was based on the grounds that the Act is contrary to certain provisions of the Minnesota Constitution and that the action proposed by the city of Pipestone is therefore unconstitutional.

A declaratory judgment action was commenced seeking a determination that the action of the city and the statute authorizing such action are not unconstitutional and requiring defendant to execute all necessary instruments on behalf of said city to accomplish the issuance of revenue bonds hereinabove described. The plaintiffs are the city of Pipestone, certain duly qualified and acting members of the city council, and Pawnee Corporation.

The district court ruled that the proposed action by the city will serve a public purpose and is constitutional and that the defendant mayor is authorized and has a duty to execute and deliver the resolution, lease, mortgage and indenture of trust, and the revenue bonds. Defendant appeals.

The sole issue under consideration herein involves the constitutionality of the Minnesota Municipal Industrial Develop-

ment Act. At the outset, it should be mentioned that the procedural steps taken by plaintiffs to accomplish the objective sought under the Act are not at issue on this appeal. Defendant concedes that all necessary documents and resolutions appear to have been prepared consistent with and in accordance with the terms of the Act and that the project has been approved by the commissioner of economic development as required by the Act.

■ In considering the constitutionality of Minn. St. 474.01 to 474.13, it must first be pointed out that statutes are to be construed so as to uphold their constitutionality and carry out the legislative intent if possible. We stated in Minneapolis Gas Co. v. Zimmerman, 253 Minn. 164, 173, 91 N. W. (2d) 642, 650:

"* * * [A]n act [of the legislature] * * * will not be declared unconstitutional unless its invalidity appears clearly or unless it is shown beyond a reasonable doubt that it violates some constitutional provision. The power of the court to declare a law unconstitutional is to be exercised only when absolutely necessary in the particular case and then with great caution."

See, also, Grobe v. Oak Center Creamery Co. 262 Minn. 60, 113 N. W. (2d) 458; Housing and Redevelopment Authority of St. Paul v. Greenman, 255 Minn. 396, 96 N. W. (2d) 673.

■ The principal challenge herein to the constitutionality of § 474.01, et seq., concerns the application of the public purpose doctrine.

Minn. Const. art. 9, in so far as here pertinent, provides:

"Section 1. * * * Taxes shall be * * * levied and collected for public purposes * * *.

\* \* \* \* \*

"Sec. 10. The credit of the State shall never be given or loaned in aid of any individual, association or corporation * * *."

Minn. Const. art. 4, § 33, provides in part:

"* * * The legislature shall pass no local or special law * * * authorizing public taxation for a private purpose."

Under the foregoing closely interrelated constitutional provisions, public funds derived from taxation may be spent only for a public purpose, and this limitation is safeguarded against indirect erosion by the specific prohibition that the credit of the state shall not be given or loaned in aid of any individual, association, or corporation. "In short, public funds shall be used solely for public purposes and shall never be used, or incumbered by pledging the state's credit, in the furtherance of any private purpose or in the aid of any private individual or entity." Minneapolis Gas Co. v. Zimmerman, 253 Minn. 164, 176, 91 N. W. (2d) 642, 651. See, also, Castner v. City of Minneapolis, 92 Minn. 84, 99 N. W. 361. Stated another way, "* * * [I]f the primary object of an expenditure of municipal funds is to subserve a public purpose, the expenditure is legal, although it may also involve as an incident an expenditure which, standing alone, would not be lawful. It is equally well settled that, if the primary object is to promote some private end, the expenditure is illegal, although it may incidentally serve some public purpose also." Burns v. Essling, 156 Minn. 171, 174, 194 N. W. 404, 405; Visina v. Freeman, 252 Minn. 177, 89 N. W. (2d) 635.

A "public purpose" within the rule that public funds may be expended only for public purposes is not susceptible of a precise definition, and each case turns upon the particular object sought to be accomplished. See, 15 McQuillin, Municipal Corporations (3 ed.) § 39.19. However, this court generally construes "public purpose" to mean "such an activity as will serve as a benefit to the community as a body and which, at the same time, is directly related to the functions of government." Visina v. Freeman, 252 Minn. 177, 184, 89 N. W. (2d) 635, 643; Port Authority of City of St. Paul v. Fisher, 269 Minn. 276, 132 N. W. (2d) 183.[2]

On several occasions this court has held that the initial responsibility for determining what is a public purpose rests with the legislature and that its findings with respect thereto are entitled

---

[2] See 15 McQuillin, Municipal Corporations (3 ed.) § 43.31, for illustrations of public purposes.

to great weight. See, also, Berman v. Parker, 348 U. S. 26, 75 S. Ct. 98, 99 L. ed. 27. However, a legislative declaration of public purpose is not always controlling. In the final analysis, the determination of public purpose rests with the courts. Burns v. Essling, *supra;* Port Authority of City of St. Paul v. Fisher, *supra;* Visina v. Freeman, *supra.* See, also, Basehore v. Hampden Industrial Development Authority, 433 Pa. 40, 248 A. (2d) 212; Mitchell v. North Carolina Industrial Development Financing Authority, 273 N. C. 137, 159 S. E. (2d) 745.

■ With the foregoing rules in mind, we proceed to an examination of the public purpose doctrine as it applies to Minn. St. c. 474. The statutory purposes of the Municipal Industrial Development Act appear in Minn. St. 474.01 as follows:

"Subd. 2. The welfare of the state requires the active promotion, attraction, encouragement, and development of economically sound industry and commerce through governmental action for the purpose of preventing, so far as possible, the emergence of blighted and marginal lands and areas of chronic unemployment. It is the policy of the state to facilitate and encourage action by local government units to prevent the economic deterioration of such areas to the point where the process can be reversed only by total redevelopment through the use of local, state, and federal funds derived from taxation, with the attendant necessity of relocating displaced persons and of duplicating public services in other areas."

Thus, the purpose of our Act as stated by the legislature is to prevent the emergence of chronic unemployment and future economic deterioration through encouragement of industrial growth. Such expansion increases per capita income by providing additional job opportunities and thus benefits the entire economy by the input of these funds.

The statute subsequently outlines factors making necessary its adoption: (a) Because of technological change, occurring in various industries, many areas are losing the economic and

human resources necessary for stability. To prevent this loss, existing and related industries must be retained and new industries developed to use these resources. (b) Other factors necessitating such action are the increasing concentration of population in urban and metropolitan areas; the consequent increase in the amount and cost of governmental services required in these areas; and the need for more intensive development and use of land to provide an adequate tax base to finance these costs.

The legislature has thus determined that the powers granted in §§ 474.01 to 474.13, including the power to acquire land for industrial development, construct industrial facilities thereon, and lease such facilities to private industry, are for a public purpose. The fact it is not stated in so many words is of no importance. See, Green v. City of Mt. Pleasant, 256 Iowa 1184, 1203, 131 N. W. (2d) 5, 17.

■ The concept of "public purpose" has proved to be an expanding one, and courts have frequently extended its permissible limits to approve public financing of currently popular projects. See, Wilmington Parking Authority v. Ranken, 34 Del. Ch. 439, 105 A. (2d) 614. We quote with approval from 37 Am. Jur., Municipal Corporations, § 120:

"* * * A public use changes with changing conditions of society, new appliances in the sciences, and other changes brought about by an increase in population and by new modes of transportation and communication. * * * Generally, a public purpose has for its objective the promotion of the public health, safety, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents within the municipal corporation, the sovereign powers of which are used to promote such public purpose. The phrase 'municipal purpose' used in the broader sense is generally accepted as meaning public or governmental purpose as distinguished from private. The modern trend of decision is to expand and liberally construe the term 'public use' in considering state and municipal activities sought to be

brought within its meaning. The test of public use is not based upon the function or capacity in which or by which the use is furnished. The right of the public to receive and enjoy the benefit of the use determines whether the use is public or private."

The concept of public purpose reaches perhaps its broadest extent under the view that economic welfare is one of the main concerns of city, state, and Federal government.

Legislation of the type under consideration herein has been adopted by many states throughout our country. Some states, where found necessary, have amended their constitutions to authorize public industrial financing of factories and equipment as a means of inducing industrial development. See, Pinsky, *State Constitutional Limitations on Public Industrial Financing: An Historical and Economic Approach*, 111 U. of Pa. L. Rev. 265. The great majority of courts have held that governmental financing for industrial development serves a public purpose.[3] Because

---

[3] The latest count indicates that the highest appellate courts of 22 jurisdictions have, without constitutional amendments, upheld the validity of legislation authorizing governmental industrial aid bonds or other types of financial assistance. Thirteen states have passed acts authorizing industrial revenue bonds under express constitutional authority. The supreme courts of only 4 states—Florida, Idaho, Massachusetts, and North Carolina—have held acts such as the one under consideration not to involve a public purpose and therefore unconstitutional. However, the Florida Supreme Court in State v. Ocean Highway and Port Authority, 217 So. (2d) 103, a decision upholding the issuance by a port authority of revenue bonds to finance the construction of a manufacturing plant to be leased to a private corporation, distinguished prior decisions which held similar transactions unconstitutional on the grounds that those decisions lacked an express legislative determination of public purpose such as appeared in the case the court was presently deciding.

For a complete list of cases as of March 1968, see Mitchell v. North Carolina Industrial Development Financing Authority, 273 N. C. 137, 159 S. E. (2d) 745. Indiana (Hawkins v. City of Greenfield, 248 Ind. 593, 230 N. E. [2d] 396), Oregon (Carruthers v. Port of Astoria, 249 Ore. 329, 438 P. [2d] 725), Pennsylvania (Basehore v. Hampden Industrial De-

of the differences in state constitutional and statutory provisions in cases arising in other jurisdictions, most of those cases offer little assistance. It is significant to note, however, that all 4 states bordering Minnesota have recently passed and upheld the validity of legislation designed to facilitate the financing of construction of new industry and the renovation and modernization of existing facilities. Should we declare our act unconstitutional, it may place Minnesota at a competitive disadvantage in attracting industry to this state. Certainly, avoidance of such results constitutes a public purpose.

The concept of public purpose has been steadily expanded in this state. In Port Authority of City of St. Paul v. Fisher, 275 Minn. 157, 145 N. W. (2d) 560, this court held that issuance of revenue bonds by a port authority to recoup funds expended to reclaim and redevelop marginal land was within the authority's power. There the authority acquired marginal lands through eminent domain proceedings. It then sought to finance the construction of an industrial building by issuing revenue bonds. The building and land were leased to a private manufacturing corporation for 30 years. In finding the existence of a public purpose, this court stated (275 Minn. 168, 145 N. W. [2d] 569):

"* * * [W]here municipal industrial financing has been challenged upon the ground of the universally recognized public purpose doctrine, a public purpose has been found whenever the location of industry would serve to alleviate problems of unemployment, inadequate wages, economic depression, or imbalance of agriculture over industry, or would appreciably increase the use of port or harbor facilities * * *."

velopment Authority, 433 Pa. 40, 248 A. [2d] 212), and South Dakota (Clem v. City of Yankton, 83 S. D. 386, 160 N. W. [2d] 125) have since joined the list of states in which legislation authorizing municipal industrial financing has been upheld. Maryland should be removed from this list, since there the validity of municipal industrial financing is unclear. Oklahoma belongs on the list authorizing industrial revenue bonds under express constitutional authority.

We held there that the community was clearly benefited by achieving productive use of reclaimed marginal land. We also held, giving due deference to the legislature's finding, that the proposed activity was directly related to the functions of government.

In Visina v. Freeman, *supra,* we held that financing the construction and improvement of port facilities as part of an overall redevelopment scheme constituted a governmental function. Less recently, public financing of a metropolitan airport was upheld in Erickson v. King, 218 Minn. 98, 15 N. W. (2d) 201. In Housing and Redevelopment Authority of St. Paul v. Greenman, *supra,* we held valid a redevelopment statute which provided for the exercise of the power of eminent domain, the expenditure of public funds, and the lending of public credit, even though the lands thus acquired were transferred by public authority to private parties. Such holding was justified on the grounds that acquisition and clearing of blighted areas serve a public purpose.

Our court has recognized that the reduction of burdens otherwise borne by property taxpayers is a public purpose. See, Penn-O-Tex Oil Co. v. City of Minneapolis, 207 Minn. 307, 291 N. W. 131. The reduction of a municipal tax burden was offered as a justification for municipal action in Anderson v. City of Montevideo, 137 Minn. 179, 162 N. W. 1073.

Green v. City of Mt. Pleasant, 256 Iowa 1184, 131 N. W. (2d) 5, bears marked similarity to the case at bar, both as to applicable statutory provisions and the facts involved. There the Iowa Supreme Court held that Iowa's municipal industrial development act was not unconstitutional and that the provisions in the contract for lease of property giving the lessee the option to purchase a plant was not contrary to the statute. The court said (256 Iowa 1195, 131 N. W. [2d] 13):

"We, like the trial court, take judicial notice that for many years there has been a continuing and discouraging decline in the population of the rural area surrounding Mt. Pleasant, agriculture is no longer as dominant and significant a factor in the

Iowa economy as it was a few generations ago and that many people are moving from Iowa farms and smaller towns because of a lack of adequate opportunities to earn a living.

"We agree with the trial court's findings the evidence shows a lack of available local capital from individuals, banks or other lending institutions to finance the project and that it will tend to stabilize the population of Mt. Pleasant.

\* \* \* \* \*

"Plaintiff's first contention is that chapter 247 violates Article VII, section 1, of the Iowa Constitution which, so far as material here, reads: 'The credit of the State shall not, in any manner, be given or loaned to, or in aid of, any individual, association, or corporation; \* \* \*.'

"Chapter 247, section 3, paragraph 1, expressly provides that revenue bonds issued under the Act 'shall not constitute nor give rise to a pecuniary liability of the municipality or a charge against its general credit or taxing powers.'

\* \* \* \* \*

"The reasoning in what seems to be the majority rule \* \* \* is more logical. Faulconer v. City of Danville [313 Ky. 468, 474, 232 S. W. (2d) 80, 84] states:

" 'Another question raised is that the scheme constitutes a device for the lending of credit of the municipality to a private corporation, in violation of Section 179 of the Constitution, which declares, "the General Assembly shall not authorize any county or subdivision thereof, city, town or incorporated district \* \* \* to loan its credit to, any corporation, association or individual, except \* \* \*."

" 'We think the foregoing consideration, that the venture does not involve the use of tax revenues, presently or in the future, answers this suggestion. It is expressly stated in the statute, ordinance and bonds, that they do not constitute an obligation of the city. Nor is there any lending of credit in other form. There is only the lending of the city's name and its commitment to render the described services and to lease the property for a

consideration, which is so valuable that the city is acquiring and will have title to property, unencumbered by a mortgage or lien, of the value of $300,000. The public treasury cannot be opened under the present statute, ordinance or contracts. The city's hand collects and dispenses the rents. It becomes a trustee but not a creditor or guarantor.'

\* \* \* \* \*

"Here the city assumes neither primary nor secondary liability in any way. Plaintiff's first contention is without merit."

The Iowa court further quoted from Faulconer v. City of Danville, 313 Ky. 468, 471, 232 S. W. (2d) 80, 82 (256 Iowa 1201, 131 N. W. [2d] 17):

"In enacting the statute under which the present venture is undertaken, the legislature deemed the acquisition and ownership by a city of an 'industrial building' to be a public project. The legislative determination of what is a public purpose will not be interfered with by the courts unless the judicial mind conceives it to be without reasonable relation to the public interest or welfare and to be without the scope of legitimate government. The concensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classed as involving a public purpose. 37 Am. Jur., Municipal Corporations, section 132."

The Iowa court went on to say (256 Iowa 1203, 131 N. W. [2d] 17):

"Plaintiff argues the city may lose a valuable asset in event of foreclosure. He fails to point out how this would be possible. The city will have paid nothing for the project. The loss, if any, is to the industry and the bondholders, not the city."

The Iowa court, quoting from Bennett v. City of Mayfield (Ky.) 323 S. W. (2d) 573, 575, stated (256 Iowa 1203, 131 N. W. [2d] 17):

"The option provision in the present plan injects a new feature. In other cases of this class it appears title to the property remained in the city and became free of the lien whenever the bonds became fully paid. It will be otherwise in this case if the lessee elects to exercise the option. The city will then have nothing tangible. But it started out on the venture with nothing. Meanwhile, the city will have had the benefits arising from a large local enterprise and the community will in the future have that, plus the taxes on the property."

■■■ In the instant case, findings based on studies conducted by the Department of Economic Development for purposes of the industrial revenue bond project indicate that the area surrounding the city of Pipestone is deteriorating economically. Although the population of Pipestone is increasing, the rural population is decreasing due to a migration of people to metropolitan centers. This population exodus is due in part to a substantially greater average per capita income in metropolitan areas. It is also caused by technological changes in methods of farming, resulting in larger farms operated by fewer people. Employment for unskilled laborers is scarce in the Pipestone area, and many farmers cannot find employment there and consequently must leave the area.

The development of industrial enterprises in the Pipestone area will substantially overcome the deteriorating economy affecting the community. The citizens of Pipestone and the residents of this state will benefit substantially from the proposed transaction. Providing gainful employment for our people will increase their purchasing power, improve their living conditions, and relieve the demand for unemployment and welfare assistance. New or modernized buildings will add properties to the tax lists and increase the tax base. There is little doubt that the establishment of new and improved industry will measurably increase the resources of the community, promote the economy of the state, and thereby contribute to the welfare of its people. These benefits are clearly public in nature.

We are also persuaded that any benefits derived by Pawnee Corporation are only incidental to the accomplishment of the primary purpose of the encouragement and development of industry in order to prevent the emergence of blighted and marginal lands and areas of chronic unemployment. It is beyond question that Pawnee Corporation will receive a large benefit from this program; however, this fact alone should not invalidate the project. Since the legislative enactment and the proposed project pursuant thereto are reasonably designed to combat a problem within the competence of the legislature, and since the public will benefit from the project, the project is sufficiently public in nature to withstand constitutional challenge.

We conclude that the Minnesota Municipal Industrial Development Act, construed in the light of conditions existing as of today, clearly permits the expenditure of public funds for a public purpose, as therein provided, and we therefore uphold the constitutionality of the Act.

Affirmed.