In re INDENTURE OF TRUST DATED AS OF MARCH 1, 1982, Re City of Duluth $10,000,000 Industrial Development Revenue Bonds, Series 1982–1 (The Triangle Corporation Project).

No. C4–88–1637.

Court of Appeals of Minnesota.

March 21, 1989.

Review Denied May 24, 1989.

Thomas R. Thibodeau, John N. Nys, Joseph J. Roby, Jr., Johnson, Killen, Thibodeau & Seiler, P.A., Duluth, and Garrard R. Beeney, Sullivan & Cromwell, New York City, for appellant Triangle Corp.

Robert E. Toftey, Michael Cowles, Fryberger, Buchanan, Smith & Frederick, P.A., Duluth, for respondent Trustee First Bank North (N.A.).

Robert C. Maki, Nikki M. Newman, Halverson, Watters, Bye, Downs & Maki, Ltd., Duluth, for respondent City of Duluth.

Thomas F. Andrew, Brown, Andrew, Hallenbeck, Signorelli & Zallar, P.A., Duluth, for respondent Directly Affiliated Labor Union 18650, AFL–CIO.

Hubert H. Humphrey, III, Atty. Gen., Christie B. Eller, Asst. Atty. Gen., St. Paul, for amicus curiae State.

James B. Loken, Faegre & Benson, Minneapolis, for Mortgagee Norwest Bank, Minnesota (N.A.).

Heard, considered and decided by SHORT, P.J., and NIERENGARTEN, and NORTON, JJ.

## OPINION

NIERENGARTEN, Judge.

This is an appeal from an order, amended order and judgment construing an indenture of trust. The appellant contends the indenture of trust was not ambiguous and claims the district court improperly imposed contractual obligations not found in the trust instrument and related documents. We affirm in part and reverse in part.

## FACTS

The Diamond Tool and Horseshoe Company (Diamond) located in Duluth, Minnesota was offered for sale in 1981. The Triangle Corporation of Delaware (Triangle) submitted an application to the City of Duluth (City) requesting financial assistance in acquiring the Diamond plant. The city council passed resolutions authorizing the City to issue $10 million in industrial development revenue bonds the proceeds of which were to be used for "the acquisition, expansion and modernization of an industrial facility and the purchase of equipment to be located in the City," all of which were to result "in the employment of additional persons to work within the facilities."

An indenture of trust between the City and First Bank North (Trustee) was executed on March 1, 1982. According to the terms of a March 1982 loan agreement, the net proceeds of the bond issue ($9,700,000) were lent to Triangle to assist the company in acquiring Diamond's capital stock and assets and to assist Triangle in its efforts to "expand, reequip and modernize" the Diamond plant. On March 18, 1982 Triangle corporate officers signed a "Certificate of Company" which was "made to induce the sale and delivery of the Bonds." The certificate stated the bond proceeds would "be used with respect to facilities located wholly within the boundaries of the City" and would be used "to acquire, construct, install and equip a facility for the manufacture of specialty hand tools."

The bonds are secured in part by the "Diamond Mortgage," among Triangle and Diamond, jointly as mortgagors, and the Trustee and Norwest Bank, jointly as mortgagees, which constitutes a lien and encumbrance against the real property, equipment and other assets of the Diamond plant. Section 3–4 of the Diamond Mortgage limits the circumstances under which Triangle can remove equipment from the Diamond plant.

The Mortgagor will not, * * * without the prior consent of the Mortgagee, remove or permit the removal or sell or otherwise surrender its right to possession of any item of Project Equipment unless (1) the Mortgagor first determines that such item has become inadequate, obsolete, worn out, unsuitable, undesirable or unnecessary for the operation of the Mortgaged Property and that such disposition will not otherwise materially impair the operating unity or structural unity of the Mortgaged Property, and (2) if the estimated fair market value of such item exceeds $500,000, the Mortgagor (1) either (a) substitutes for such item machinery or equipment of substantially equivalent utility to that replaced or (b) pays to the Trustee for deposit in the Bond Fund (as defined in the Indenture) a sum equal to the fair market value of the item to be replaced and (2) notifies the Mortgagee of the action the Mortgagor intends to take with respect to such item of Project Equipment, provided that if any Project Equipment is removed under the provisions of this Section the Mortgagor or lessee shall repair and restore any and all damage to the Mortgaged Property resulting from the removal of such items.

From March 1982 until March 1988, Triangle transferred equipment between its Utica plant in South Carolina and the Diamond plant in Duluth. Triangle asserts the initial transfers were intended to avoid duplication and balance production at the two plants and claims the transfers were undertaken in furtherance of its plans to consolidate and modernize production at its facilities. Triangle asserts the general nature of its plan was communicated to City officials during negotiations and contends it advised the parties that it would transfer some equipment. No item of equipment transferred from the Diamond plant had a fair market value in excess of $500,000 and the majority of the equipment is being used at the Utica plant. The production of some hand tools was transferred from Diamond to Utica from March 1982 to March 1988, and further product line transfers were planned for December 1987 to March 1989 under Triangle's "plant consolidation" project.

Sometime after the Diamond acquisition, the market for American–made hand tools apparently weakened. The number of

hourly employees at the Diamond plant decreased from 534 in March 1982 to 334 in December 1987; the number of hourly employees at Triangle's Utica plant decreased from 535 to 439 during that same time period.

In 1987, the City challenged Triangle's transfers of equipment and production lines out of the Diamond plant. The City claimed the transfers were improper under the terms of the bond documents and violated Minnesota's Municipal Industrial Development Act. Although the parties agreed no default under the financing documents occurred, the City and Triangle requested the Trustee to seek instructions in the administration of the trust from the district court because the parties disagreed whether the transfers were allowable under the indenture of trust and other bond documents. Accordingly, the Trustee asked the district court to: (1) construe the provisions of the Diamond Mortgage, the loan agreement and the indenture which relate to equipment transfers; (2) determine whether past equipment transfers from the Diamond plant to the Utica facility constitute events of default under the Diamond Mortgage, the loan agreement or the indenture; (3) determine under what circumstances future equipment transfers of Diamond equipment could be made, if at all; and (4) determine whether removal of the Diamond equipment violated the Municipal Industrial Development Act.

The district court determined Triangle was not in default in making its payments under the loan agreement. The court found that Triangle added more than $1 million in assets to the Diamond plant, including $576,637 in machinery and equipment, and that Triangle performed maintenance on the Diamond property. However, the court found that Triangle officers developed a plan called "Project Alpha" by mid–1983, the objective of which was to transfer all manufacturing operations from Diamond to the Utica plant in South Carolina and close the Diamond plant within three years. The court also found that Triangle developed its "Consolidation Plan" by 1986, the purpose of which was to transfer the tool production lines, the warehouse/packing/shipping department and much of the Diamond forging operation to South Carolina. According to the plan, Diamond would manufacture only horseshoes and serve as a satellite distribution center and eventually would be shut down. The court found Triangle moved the packing and shipping department from Diamond to South Carolina in 1987 pursuant to its Consolidation Plan after the labor union rejected Triangle's proposed wage reduction and that Triangle transferred the production of certain hand tools with associated machinery without replacing those operations with comparable production.

The court concluded the documents executed by the parties as well as the parties' conduct showed the City and Triangle intended and contracted in March 1982 that Triangle would "purchase and operate Diamond Tool as a fully integrated, fully operating tool manufacturing facility within the City limits." According to the court, Triangle was bound to make a "good faith" determination about the "inadequate, obsolete, worn out, unsuitable, undesirable or unnecessary" condition of equipment at the Diamond plant. The court concluded that the equipment transferred to the Utica plant was "Project Equipment" within the meaning of the Diamond Mortgage, that the equipment transfers had not been made in good faith, that the equipment "in most cases was not inadequate, obsolete, worn out, unsuitable, undesirable or unnecessary for the operation of the Diamond plant," and that the transfers "materially impaired the operating unity of the Diamond plant." Although the court accepted the parties' conclusion that the equipment transfers did not constitute an event of default under the financing documents, the court concluded Triangle "attempted to violate the spirit, intent and purpose of the Minnesota Municipal Industrial Development Act."

The court also defined the term "operating unity" which was not defined in the bond documents as drafted by the parties.

"Operating unity" of the Diamond plant means a fully integrated, fully operating tool manufacturing facility, including a functional packing and shipping depart-

ment, such a tool manufacturing facility includes, without limitations, designing, purchasing, forging, heat treating, drawing, milling, drilling, broaching, grinding, sanding, slotting, treading, assembly, packing, shipping and sales capacity.

* * * Maintaining the "operating unity" of the Diamond plant includes, without limitation, maintaining and utilizing or substituting equipment with a substantially equivalent "production capacity" and "income producing capacity" as existed in 1982.

The court further ordered:

To avoid an event of default under the Diamond Mortgage, Loan Agreement and Indenture and Minnesota State Law Triangle shall within 90 days:

a. Return to the Diamond plant the shipping and packing equipment previously removed.

b. Return to the Diamond plant [specified] "project equipment" * * * which has not or will not within 90 days be replaced with equipment with "production capacity" and "income producing capacity" substantially equivalent to that which was removed.

Triangle could transfer or remove project equipment in the future "only to the extent it is replaced or substituted with equipment of comparable 'production capacity' and 'income producing capacity' to maintain the Diamond plant's 'operating unity.' " The court ordered Triangle to make written determinations that items are inadequate, obsolete, worn out, unsuitable, undesirable or unnecessary for operation of the Diamond plant, certify that such designations will not materially impair the operating or structural unity of the plant, and provide a list of "replacement or substitute items of comparable production and income producing capacity." Triangle was ordered to submit those determinations, certifications and replacement lists to the Trustee and the City at least fifteen days prior to any planned removal. The City is required to consult with the labor union and provide the Trustee with a written opinion within five days on whether the removal meets the stated criteria. The Trustee is required

to consent or withhold its consent to future equipment removals after considering the City's opinion and the listed criteria and must notify Triangle of its determination five days prior to the planned removal. Finally, the court ordered the Trustee to administer the trust in compliance with the court's instructions as long as the bonds remain outstanding and ruled the parties were responsible for their own attorney fees and costs.

Triangle appealed the district court's orders. The City filed a notice of review.

## ISSUES

1. Did the district court err by concluding section 3–4 of the Diamond Mortgage is ambiguous?

2. Did the district court err by imposing limitations on the transfer of equipment to locations outside of Minnesota?

3. Does the district court's restrictions on equipment removals violate the commerce clause of the Constitution?

4. Did the district court err by refusing to award the City attorney fees?

5. Did the district court err by denying the City access to certain files retained by a law firm which was disqualified from the case by the court?

## ANALYSIS

"Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous." Minn.R. Civ.P. 52.01.

### 1. Contract Ambiguity

 The parties dispute whether section 3–4 of the Diamond Mortgage is ambiguous and argue whether the court could properly consider the affidavit of the bond attorney who drafted the mortgage and other bond documents. Whether a contract is ambiguous and therefore subject to construction is a legal question for the district court's determination. *See Employers Liability Assurance Corp. v. Morse*, 261 Minn. 259, 263, 111 N.W.2d 620, 624 (1961). On appeal, this court must determine whether the district court correctly decided

the issue of ambiguity and "whether the proper interpretation was given to the language used by the parties." *See id.* at 264, 111 N.W.2d at 624.

The bond attorney who drafted the instrument stated by affidavit that the parties were told the term "operating unity" "imposes a *functional* test" and that removal of specific project equipment "must not impair the plant's capabilities as a manufacturing facility." Even if the attorney's affidavit is considered, it is questionable whether the meaning of the term "operating unity" is sufficiently clarified by the statement to render the Diamond Mortgage unambiguous because it still is not clear what the term "capabilities as a manufacturing facility" means and the attorney's statement does not clarify the parties' intent in drafting the mortgage document.

Triangle contends the term "operating unity" means the Diamond plant only must retain *some* manufacturing capability. The City and labor union contend "operating unity" means the Diamond plant must substantially retain its capability to manufacture the various specialized hand tools which were manufactured at the plant prior to its acquisition by Triangle. Since there is no indication in the record that the term "operating unity" is a term of art with specialized or known definition and it is not clear that the term otherwise has an obvious meaning, the district court did not err by concluding section 3–4 of the Diamond Mortgage is ambiguous and therefore subject to judicial construction. *See id.* at 264, 111 N.W.2d at 624 ("A contract is ambiguous if it is reasonably susceptible to more than one construction.").

### 2. *Equipment Transfer Restrictions*

Since the district court correctly concluded section 3–4 of the Diamond Mortgage was ambiguous, the court could construe the parties' contract "to determine and give effect to the intent of the parties to the contract." *See Davis v. Outboard Marine Corp.*, 415 N.W.2d 719, 723 (Minn.Ct.App. 1987), *pet. for rev. denied* (Minn. Jan. 28, 1988) (citing *Karim v. Werner*, 333 N.W.2d 877, 879 (Minn.1983)). The parties' intent

should be determined "from a process of synthesis in which words and phrases are given a meaning in accordance with the obvious purpose of the * * * contract as a whole." *Davis*, 415 N.W.2d at 723 (quoting *Cement, Sand & Gravel Co. v. Agricultural Insurance Co.*, 225 Minn. 211, 216, 30 N.W.2d 341, 345 (1947)).

After reviewing the entire record, it appears the parties intended the bond proceeds would be used to continue the existing manufacturing capabilities of the Diamond plant as well as the production of various lines of specialized hand tools. Triangle represented in its application to the City that its acquisition of the Diamond plant would create "approximately 150 new, permanent jobs at Diamond" and that it would update Diamond's manufacturing methods so as to retain an increased number of permanent jobs at the Duluth plant. Both the City and Triangle indicated at the time Triangle acquired Diamond that the Diamond plant would be expanded, re-equipped and modernized as a result of Triangle's acquisition.

Although the record indicates the parties discussed a restriction which would have required Triangle to guarantee certain employment levels at Diamond, Triangle did not agree to those restrictions and the parties' final agreements did not contain specific employment levels. The provision in section 3–4 of the Diamond Mortgage which allows equipment transfers also indicates the parties understood and agreed there would be some production and management consolidation between the Utica and Diamond plants, and the record indicates the City was advised by Triangle during negotiations that some equipment would be transferred between the plants. Consequently, it is apparent the parties realized Triangle's acquisition of Diamond probably could result in employment and production changes at the Diamond plant. However, the record as a whole indicates the parties intended the Diamond plant would retain its hand tool production at least to a substantial extent.

The parties dispute whether the Municipal Industrial Development Act precludes

Triangle from transferring equipment from the Diamond plant to South Carolina. There is no dispute that section 3–4 of the Diamond Mortgage permits Triangle to remove some equipment from Diamond and the parties agree that equipment removals have not yet constituted an event of default under the bond documents. As the Trustee correctly indicates, the restrictions on project equipment transfers under section 3–4 of the Diamond Mortgage essentially are restrictions on collateral, the location of which is immaterial to the mortgagees. However, it is questionable whether substantial equipment transfers are allowable under the Municipal Industrial Development Act because the equipment was purchased in part with proceeds from bonds issued in this state for the express purpose of serving the public in this state.

■ Expenditures of public funds which benefit a private corporation do not necessarily "invalidate" the project. *See City of Pipestone v. Madsen,* 287 Minn. 357, 373, 178 N.W.2d 594, 603 (1970). However, public monies cannot be used for private purposes unless they serve some "public purpose." *See id.* at 363–64, 178 N.W.2d at 598–99; *see also* Minn. Const. art. X, § 1, art. XII, § 1. The purpose of the Municipal Industrial Development Act which authorizes cities to issue industrial development revenue bonds "is to prevent the emergence of chronic unemployment and future economic deterioration through encouragement of industrial growth." *Madsen,* 287 Minn. at 365, 178 N.W.2d at 599.

■ Even though Triangle theoretically could transfer a substantial amount of equipment from the Diamond plant and locate that equipment outside Minnesota without violating section 3–4 of the Diamond Mortgage, it is questionable whether Triangle could use bond proceeds to purchase a Minnesota company and then transfer a substantial amount of that company's equipment out of state without violating the Municipal Industrial Development Act. At some point Triangle's equipment transfers will both "materially impair the operating unity" of the Diamond plant and fail to "encourage economic growth" in this

state. *See id.* Although we believe it is unreasonable to conclude the Municipal Industrial Development Act precludes companies from removing *any* equipment out of state because such a limitation would undermine the general economic development goals of the Act by discouraging outside investments in Minnesota, we believe the Act prohibits companies from purchasing assets in Minnesota with bond proceeds and then transferring substantial portions of those assets outside of this state to the detriment of its residents.

■ Under the circumstances, we believe the district court's orders requiring Triangle to replace all equipment removed from the Diamond plant within ninety days are improper. The parties expressly agreed Triangle could remove equipment under certain circumstances and all parties agree the equipment transfers do not yet constitute a default under the terms of the bond documents. In addition, the record indicates the Diamond plant still retains some hand tool manufacturing capabilities; the Trustee asserts the "operating unity" of the Diamond plant has not yet been materially impaired. The record indicates the City and the labor union anticipated the Diamond plant eventually would be closed down after its owners put the company up for sale and the parties clearly understood some changes could be made. Triangle cannot be held totally responsible for the vicissitudes of product demand affected by international markets.

■ In light of the apparent economic realities, the parties' agreement allowing some equipment transfers and the parties' failure to agree on specific employment levels at the Diamond plant, we believe the district court's order requiring Triangle to maintain the Diamond plant at the "substantially equivalent 'production capacity' and 'income producing capacity' as existed in 1982" is clearly erroneous. The court's order requiring Triangle to specifically identify equipment removals and certify that transfers will not materially impair the operating unity of the Diamond plant, and its order requiring the Trustee to consent to those transfers after considering the

City's opinion appear to be a reasonable and workable procedure for ensuring that the public funds expended by Triangle to acquire the Diamond plant continue to serve some public purpose in this state. Accordingly, we reverse the district court's judgment insofar as it orders Triangle to return equipment at the Utica plant which was transferred from the Diamond plant. We affirm those portions of the judgment which require Triangle to operate the Diamond plant as a manufacturing facility for specialty hand tools and which establish a procedure for making future equipment transfers.

### 3. Commerce Clause Issue

■ Triangle asserts Minnesota's Municipal Industrial Development Act violates the commerce clause of the United States Constitution if the Act prohibits Triangle from using outside of Minnesota equipment it purchased in this state. Triangle did not raise this issue before the district court and there is nothing in the record indicating the district court ever considered or decided this issue. Accordingly, this court will not consider or decide this issue on appeal. *See City of Chanhassen v. County of Carver*, 369 N.W.2d 297, 300 (Minn.Ct.App. 1985) (the court of appeals "will not rule on the constitutionality of statutes when the issue was not considered or ruled upon by the trial court").

### 4. Attorney Fees

■ The City argues on appeal that the district court erred by failing to award it attorney fees and claims it is entitled to recover attorney fees under section 9.05 of the loan agreement which states:

If an Event of Default shall exist under this Agreement and the Issuer [City] or the Trustee should employ attorneys or incur other expenses for the collection of any amounts due hereunder, or the enforcement of performance of any obligation of agreement on the part of the Company [Triangle], the Company will upon demand pay to the Issuer or the Trustee the reasonable fees of such attorneys and such other expenses so incurred.

The language of section 9.05 indicates that neither the City nor the Trustee is entitled to claim attorney fees unless "an Event of Default shall exist." Since the parties agree and the district court concluded no event of default has yet occurred, the district court did not err by declining to award the City attorney fees and costs. *Cf. Erlandson Implement, Inc. v. First State Bank of Brownsdale*, 400 N.W.2d 421, 427 (Minn.Ct.App.1987) (implement dealers were not entitled to recover attorney fees from the bank in part because the dealers' actions were not for "collection" purposes as stated in the security agreement); *St. Paul Professional Employees Association v. City of St. Paul*, 303 Minn. 106, 109, 226 N.W.2d 311, 313 (1975) (unless authorized by statute, attorney fees generally are not allowed in civil actions).

### 5. Discovery Issue

■ The City sought access to bond files kept at the offices of a law firm which the district court disqualified from this case. The firm made its bond file available to the parties but declined to relinquish certain files on the grounds that the documents were privileged or were attorney work product. The City moved the district court to order the production of those files; the district court declined.

There is no indication in the record that the City was materially prejudiced by the district court's decision not to compel production of those files and it is not clear whether the City specifically knew what documents it was seeking. The district court was in the best position to determine the propriety of the City's request and was familiar with this case. We cannot conclude the court abused its discretion by denying the City's discovery motion. *See Peters v. Peters*, 374 N.W.2d 335, 337 (Minn.Ct.App.1985) ("The trial court has broad discretion in determining matters related to discovery.").

### DECISION

The district court did not err by concluding section 3–4 of the Diamond Mortgage is

ambiguous. The district court also did not err by establishing a procedure governing future equipment transfers, by denying the City's discovery motion or by denying the City's request for attorney fees. We reverse the portions of the judgment which require Triangle to return equipment at the Utica plant which was transferred from the Diamond plant.

Affirmed in part and reversed in part.